Barry I. Levy, Esq.
Steven Henesy, Esq.
Philip P. Nash, Esq.
Michael Vanunu, Esq.
RIVKIN RADLER LLP
926 RXR Plaza
Uniondale, New York 11556
(516) 357-3000

*Counsel for Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company and GEICO Casualty Company*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

GOVERNMENT EMPLOYEES INSURANCE COMPANY, GEICO INDEMNITY COMPANY, GEICO GENERAL INSURANCE COMPANY and GEICO CASUALTY COMPANY,

Docket No.: _____(    )

Plaintiffs,

-against-

GONI MEDICAL SUPPLY CORP., PRO HEALTH SUPPLY CORP., LIGA MEDICAL SUPPLY CORP., CURATECH MED SUPPLY INC., NIKA GOGINAVA, ARTHUR KATSNELSON, VITALIY NAROVLYANSKY, AARON ISAAKOV, and JOHN DOE DEFENDANTS "1" – "10",

Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

# COMPLAINT

Plaintiffs, Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company and GEICO Casualty Company (collectively "GEICO" or "Plaintiffs"), as and for their Complaint against Defendants Goni Medical Supply Corp., Pro Health Supply Corp., Liga Medical Supply Corp., Curatech Med Supply Inc., Nika Goginava, Arthur Katsnelson, Vitaliy Narovlyansky, Aaron Isaakov (collectively, the "Defendants"), and

John Doe Defendants "1" through "10" (the "John Doe Defendants"), hereby allege as follows:

## NATURE OF THE ACTION

1. GEICO brings this action to recover more than $1 million that Defendants have wrongfully obtained from GEICO by submitting and causing hundreds of fraudulent no-fault insurance charges to be submitted relating to medically unnecessary, illusory, and otherwise non-reimbursable durable medical equipment ("DME") and orthotic devices ("OD") (e.g. lumbar-sacral supports, osteogenesis bone stimulators, orthopedic pillows, massagers, electronic heat pads, egg crate mattresses) (collectively, the "Fraudulent Equipment") through a series of companies known as Goni Medical Supply Corp. ("Goni Supply"), Pro Health Supply Corp. ("Pro Health Supply"), Liga Medical Supply Corp. ("Liga Supply"), and Curatech Med Supply Inc. ("Curatech Supply") (collectively, the "DME Entities").

2. The DME Entities are all New York corporations that have sequentially dispensed DME and OD to persons who were allegedly involved and injured in automobile accidents and were entitled for coverage under no-fault insurance policies issued by GEICO ("Insureds") as part of a "quick hit" scheme to submit a large volume of billing to GEICO and other New York automobile insurance companies for Fraudulent Equipment.

3. While the DME Entities are owned on paper by Nika Goginava ("Goginava"), Arthur Katsnelson ("Katsnelson"), Vitaliy Narovlyansky ("Narovlyansky"), and Aaron Isaakov ("Isaakov") (collectively, the "Paper Owner Defendants"), at all times they were actually operated and controlled by others not presently identifiable to GEICO.

4. The Defendants, in conjunction with others not presently identifiable to GEICO, devised a fraudulent scheme that involved (i) associating and colluding with the layperson operators and managers (the "Clinic Controllers") of various No-Fault medical clinics (the

"Clinics"), (ii) obtaining prescriptions through the payment of kickbacks and other financial incentives for medically unnecessary DME/OD purportedly issued by healthcare providers (the "Referring Providers") who were working out of Clinics in the New York metropolitan area, and (iii) using these prescriptions for medically unnecessary DME/OD to submit billing to GEICO and other New York automobile insurers with each DME Entity making common fraudulent misrepresentations regarding the type and nature of the Fraudulent Equipment in order to inflate the charges to GEICO and maximize Defendants' ill-gotten gains. Through the fraudulent scheme, Defendants billed GEICO alone more than $2.9 million in a period of just four months between September and December 2025. As part of their scheme to extract money from GEICO and avoid detection, Defendants shifted the billing submitted to GEICO from one DME Entity to the next and continue to seek to collect on the fraudulent billing through today.

5. GEICO seeks to terminate this fraudulent scheme and recover more than $1 million that has been wrongfully obtained by the Defendants since 2025 and, further, a declaration that it is not legally obligated to pay reimbursement of more than $1.2 million in pending no-fault insurance claims that have been submitted by or on behalf of the DME Entities since 2025 because:

(i) The Defendants billed GEICO for Fraudulent Equipment pursuant to a fraudulent scheme that was designed and implemented to exploit Insureds for financial gain so as to benefit the Defendants and others not presently known (i.e. the John Doe Defendants), without regard for genuine patient care and which included dispensing Fraudulent Equipment that was not medically necessary and which was prescribed pursuant to predetermined fraudulent protocols, including prescriptions issued and secured through collusive arrangements;

(ii) The Defendants billed GEICO for Fraudulent Equipment that was provided – to the extent actually provided – as a result of decisions made by laypersons, not based upon prescriptions issued by the Referring Providers who are licensed to issue such prescriptions;

(iii) To the extent that any Fraudulent Equipment was provided to Insureds, the bills for the Fraudulent Equipment submitted to GEICO by the Defendants

fraudulently misrepresented the type and nature of the Fraudulent Equipment purportedly provided to Insureds in order to fraudulently inflate the reimbursement rate for the Fraudulent Equipment, as the Healthcare Common Procedure Coding System ("HCPCS") Codes identified in the bills did not accurately represent what was provided to Insureds; and

(iv) To the extent that any Fraudulent Equipment was provided to Insureds, the bills for Fraudulent Equipment submitted to GEICO by Defendants fraudulently and grossly inflated the permissible reimbursement rate that Defendants could have received for the Fraudulent Equipment.

6. The Defendants fall into the following categories:

(i) The DME Entities are New York corporations that are used as the billing arm of the fraudulent scheme – they purport to provide Fraudulent Equipment to persons who were allegedly injured in motor vehicle accidents, and bill New York automobile insurance companies, including GEICO;

(ii) Defendant Goginava is one of the primary drivers of the fraudulent scheme – they are listed on paper as the owner, operator, and controller of Goni Supply, when, as discussed below, Goginava works for one of the John Doe Defendants who secretly controls and profits from all the DME Entities, and used Goni Supply to submit bills to GEICO and other New York automobile insurance companies for Fraudulent Equipment purportedly provided to automobile accident victims;

(iii) Defendant Katsnelson is also one of the primary drivers of the fraudulent scheme – they are listed on paper as the owner, operator, and controller of Pro Health Supply, when, as discussed below, Katsnelson works for one of the John Doe Defendants who secretly controls and profits from all the DME Entities, and used Pro Health Supply to submit bills to GEICO and other New York automobile insurance companies for Fraudulent Equipment purportedly provided to automobile accident victims;

(iv) Defendant Narovlyansky is another of the primary drivers of the fraudulent scheme – they are listed on paper as the owner, operator, and controller of Liga Supply, when, as discussed below, Narovlyansky works for one of the John Doe Defendants who secretly controls and profits from all the DME Entities, and used Liga Supply to submit bills to GEICO and other New York automobile insurance companies for Fraudulent Equipment purportedly provided to automobile accident victims;

(v) Defendant Isaakov is another of the primary drivers of the fraudulent scheme – they are listed on paper as the owner, operator, and controller of Curatech Supply, when, as discussed below, Isaakov works for one of the

John Doe Defendants who secretly controls and profits from all the DME Entities, and used Curatech Supply to submit bills to GEICO and other New York automobile insurance companies for Fraudulent Equipment purportedly provided to automobile accident victims; and

(vi) The John Doe Defendants are the other individuals involved in the fraudulent scheme – while they are presently not identifiable they include the person(s) secretly controlling and profiting from the DME Entities and the Clinic Controllers who are associated with the Clinics and have colluded with Defendants to further drive and financially benefit from the common fraudulent scheme committed against GEICO and other New York automobile insurers through their associations with the Referring Providers and control of the Clinics.

7. As discussed below, Defendants have always known that the claims for Fraudulent Equipment submitted to GEICO were fraudulent because: (i) the billing submitted to GEICO and other New York automobile insurers was pursuant to a fraudulent scheme that was designed and implemented to exploit Insureds for financial gain so as to benefit the Defendants and others not presently known (i.e. the John Doe Defendants), without regard for genuine patient care, and which included dispensing Fraudulent Equipment that was not medically necessary and prescribed pursuant to predetermined fraudulent protocols, including prescriptions secured through collusive arrangements; (ii) the Fraudulent Equipment was provided as a result of decisions made by laypersons, not based upon prescriptions issued by healthcare providers who are licensed to issue such prescriptions; (iii) the bills fraudulently misrepresented the type and nature of the Fraudulent Equipment purportedly provided to the Insureds; and (iv) the charges were intentionally inflated based upon an exploitation of the payment formulas set forth in New York's "No-Fault" laws.

8. As such, Defendants do not now have – and never had – any right to be compensated for the Fraudulent Equipment billed to GEICO through the DME Entities.

9. The charts attached hereto as Exhibits "1" through "4" set forth a representative sample of the fraudulent claims that have been identified to date that were submitted, or caused to

be submitted, to GEICO pursuant to Defendants' fraudulent scheme through Goni Supply, Pro Health Supply, Liga Supply, and Curatech Supply.

10. Defendants' fraudulent scheme against GEICO and the New York automobile insurance industry began in 2025 and has continued uninterrupted through the present day, as Defendants continue to seek to collect from GEICO on pending charges for the Fraudulent Equipment.

11. As a result of Defendants' fraudulent scheme, GEICO has incurred damages of more than $1 million, which represents payments made by GEICO based on the representations contained in the billing submitted by the Defendants.

## THE PARTIES

### I. Plaintiffs

12. Plaintiffs, Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company, and GEICO Casualty Company are Nebraska corporations with their principal places of business in Bethesda, Maryland. GEICO is authorized to conduct business and to issue policies of automobile insurance in the State of New York.

### II. Defendants

13. John Doe Defendant "1" (hereinafter, the "Secret Owner") is presently not identifiable but is secretly controlling and profiting from the DME Entities, and who conspired with the Defendants and others who are not presently identifiable at various Clinics, to obtain prescriptions for medically unnecessary Fraudulent Equipment purportedly issued by the Referring Providers which were used by the Defendants as the basis to submit bills to GEICO and other New York automobile insurers seeking payment for the Fraudulent Equipment.

14. Defendant Goginava resides in and is a citizen of New York and is listed as the

paper owner of Goni Supply. Goginava is not and has never been a licensed healthcare provider. Goginava, at all relevant times, has been one of the primary drivers of the fraudulent scheme, as they participated in a scheme with the Secret Owner purporting to own, operate, and control Goni Supply, associated with others not presently identifiable to obtain the illegitimate and medically unnecessary prescriptions from the Referring Providers, and used those prescriptions to submit bills to GEICO and other New York automobile insurance companies for the Fraudulent Equipment.

15. Defendant Goni Supply is a New York corporation that was incorporated on or about July 28, 2025, has its principal place of business in Kings County, New York, and is owned on paper and purportedly operated and controlled by Goginava. In actuality, the Secret Owner secretly operates, manages, controls and profits from Goni Supply and, with the aid of Goginava, used Goni Supply as a vehicle to submit fraudulent billing to GEICO and other New York automobile insurers.

16. Defendant Katsnelson resides in and is a citizen of New York and is listed as the paper owner of Pro Health Supply. Katsnelson is not and has never been a licensed healthcare provider. Katsnelson, at all relevant times, has been one of the primary drivers of the fraudulent scheme, as they participated in a scheme with the Secret Owner purporting to own, operate, and control Pro Health Supply, associated with others not presently identifiable to obtain the illegitimate and medically unnecessary prescriptions from the Referring Providers, and used those prescriptions to submit bills to GEICO and other New York automobile insurance companies for the Fraudulent Equipment.

17. Defendant Pro Health Supply is a New York corporation that was incorporated on or about September 8, 2025, has its principal place of business in Kings County, New York, and

is owned on paper and purportedly operated and controlled by Katsnelson. In actuality, the Secret Owner secretly operates, manages, controls and profits from Pro Health Supply and, with the aid of Katsnelson, used Pro Health Supply as a vehicle to submit fraudulent billing to GEICO and other New York automobile insurers.

18. Defendant Narovlyansky resides in and is a citizen of New York and is listed as the paper owner of Liga Supply. Narovlyansky is not and has never been a licensed healthcare provider. Narovlyansky, at all relevant times, has been one of the primary drivers of the fraudulent scheme, as they participated in a scheme with the Secret Owner purporting to own, operate, and control Liga Supply, associated with others not presently identifiable to obtain the illegitimate and medically unnecessary prescriptions from the Referring Providers, and used those prescriptions to submit bills to GEICO and other New York automobile insurance companies for the Fraudulent Equipment.

19. Defendant Liga Supply is a New York corporation that was incorporated on or about October 21, 2025, has its principal place of business in Kings County, New York, and is owned on paper and purportedly operated and controlled by Narovlyansky. In actuality, the Secret Owner secretly operates, manages, controls and profits from Liga Supply and, with the aid of Narovlyansky, used Liga Supply as a vehicle to submit fraudulent billing to GEICO and other New York automobile insurers.

20. Defendant Isaakov resides in and is a citizen of New York and is listed as the "paper" owner of Curatech Supply. Isaakov is not and has never been a licensed healthcare provider. Isaakov, at all relevant times, has been one of the primary drivers of the fraudulent scheme, as they participated in a scheme with the Secret Owner purporting to own, operate, and control Curatech Supply, associated with others not presently identifiable to obtain the illegitimate

and medically unnecessary prescriptions from the Referring Providers, and used those prescriptions to submit bills to GEICO and other New York automobile insurance companies for the Fraudulent Equipment.

21. Defendant Curatech Supply is a New York corporation that was incorporated on or about September 11, 2025, has its principal place of business in Kings County, New York, and is owned on paper and purportedly operated and controlled by Isaakov. In actuality, the Secret Owner secretly operates, manages, controls and profits from Curatech Supply and, with the aid of Isaakov, used Curatech Supply as a vehicle to submit fraudulent billing to GEICO and other New York automobile insurers.

22. The John Doe Defendants are individuals who are not presently identifiable and include the Clinic Controllers associated with the Clinics, who are not licensed healthcare professionals but who unlawfully own and control the Clinics and the relationships with the Referring Providers, and who have conspired with the Defendants and Secret Owner to further the fraudulent scheme committed against GEICO and other New York automobile insurers for their own economic benefit.

## JURISDICTION AND VENUE

23. This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1332(a)(1) because the matter in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs, and is between citizens of different states.

24. Pursuant to 28 U.S.C. § 1331, this Court also has jurisdiction over the claims brought under 18 U.S.C. §§ 1961 et seq. (the Racketeer Influenced and Corrupt Organizations ["RICO"] Act) because they arise under the laws of the United States. In addition, this Court has supplemental jurisdiction over the subject matter of the claims asserted in this action pursuant to

28 U.S.C. § 1367.

25. Venue in this District is appropriate pursuant to 28 U.S.C. § 1391, as the Eastern District of New York is the District where a substantial amount of the activities forming the basis of the Complaint occurred and is the District where one or more of Defendants reside.

## ALLEGATIONS COMMON TO ALL CLAIMS

26. GEICO underwrites automobile insurance in the State of New York.

### I. An Overview of the Pertinent Laws

#### A. Pertinent Laws Governing No-Fault Insurance Reimbursement

27. New York's "No-Fault" laws are designed to ensure that injured victims of motor vehicle accidents have an efficient mechanism to pay for and receive the healthcare services that they need.

28. Under New York's Comprehensive Motor Vehicle Insurance Reparations Act (N.Y. Ins. Law §§ 5101, et seq.) and the regulations promulgated pursuant thereto (11 N.Y.C.R.R. §§ 65, et seq.) (collectively referred to as the "No-Fault Laws"), automobile insurers are required to provide Personal Injury Protection Benefits ("No-Fault Benefits") to Insureds.

29. In New York, No-Fault Benefits include up to $50,000.00 per Insured for medically necessary expenses that are incurred for healthcare goods and services, including goods for DME and OD. See N.Y. Ins. Law § 5102(a).

30. In New York, claims for No-Fault Benefits are governed by the New York Workers' Compensation Fee Schedule (the "New York Fee Schedule").

31. Pursuant to the No-Fault Laws, healthcare service providers are not entitled to bill for or collect No-Fault Benefits if they fail to meet any New York State or local licensing requirements necessary to provide the underlying services.

32. The implementing regulation adopted by the Superintendent of Insurance, 11 N.Y.C.R.R. § 65-3.16(a)(12) states, in pertinent part, as follows:

> A provider of health care services is not eligible for reimbursement under section 5102(a)(1) of the Insurance Law if the provider fails to meet any applicable New York State or local licensing requirement necessary to perform such service in New York.

33. Pursuant to a duly executed assignment, a healthcare provider may submit claims directly to an insurance company and receive payment for medically necessary goods and services, using the claim form required by the New York State Department of Insurance (known as "Verification of Treatment by Attending Physician or Other Provider of Health Service" or, more commonly, as an "NF-3").

34. In the alternative, a healthcare service provider may submit claims using the Healthcare Financing Administration insurance claim form (known as the "HCFA-1500" or "CMS-1500 form").

35. Pursuant to Section 403 of the New York State Insurance Law, the NF-3 Forms submitted by healthcare service providers to GEICO, and to all other insurers, must be verified subject to the following warning:

> Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime.

36. Similarly, all HCFA-1500 (CMS-1500) forms submitted by a healthcare service provider to GEICO, and all other automobile insurers, must be verified by the healthcare service provider, subject to the following warning:

> Any person who knowingly files a statement of claim containing any misrepresentation or any false, incomplete, or misleading information may be guilty of a criminal act punishable under law and may be subject to civil penalties.

**B. Pertinent Regulations Governing No-Fault Benefits, DME and OD**

37. Under the No-Fault Laws, No-Fault Benefits can be used to reimburse medically necessary DME or OD that was provided pursuant to a lawful prescription from a licensed healthcare provider. See N.Y. Ins. Law § 5102(a). A clinically legitimate prescription reflects independent medical decision making and should be supported by contemporaneous documentation which reflects a patient's specific condition, functional need, and therapeutic purpose for each prescribed item of DME or OD. By extension, DME or OD that was prescribed pursuant to predetermined protocols lacking medical necessity, provided without a prescription, pursuant to an unlawful prescription, or pursuant to a prescription from a layperson or individual not lawfully licensed to provide prescriptions, is not reimbursable under No-Fault.

38. Under New York State's Public Health Law, "a practitioner may not make a referral to a health care provider for the furnishing of any health or health related items or services where such practitioner . . . has any of the following financial relationships without disclosing to the patient such financial relationship: . . . (b) a compensation arrangement". See N.Y. P.H.L. § 238-d(1). A practitioner is defined to include "a licensed or registered physician, dentist, podiatrist, chiropractor, nurse, midwife, physician assistant or specialist assistant, physical therapist, or optometrist". See N.Y. P.H.L. § 238(11).

39. A health care provider is defined to include "a purveyor of health or health related supplies, appliances or equipment", which are DME suppliers such as the DME Entities. See N.Y. P.H.L. § 238(6). A compensation arrangement, as referenced in N.Y. P.H.L. § 238-d, includes any remuneration, whether directly, indirectly, overly, covertly, in cash, or in kind that is between a practitioner and a health care provider. See N.Y. P.H.L. § 238-a(5)(a).

40. DME generally consists of items that can withstand repeated use and primarily

consists of items used for medical purposes by individuals in their homes. DME should not be prescribed merely because a patient reports pain but is prescribed when the device(s) serves a defined medical purpose, such as stabilization, mobility assistance, pressure relief, or functional support that is reasonably necessary for that patient's documented condition. For example, DME can include items such as bed boards, cervical pillows, orthopedic mattresses, electronic muscle stimulator units ("EMS units"), hot/cold packs, infrared heat lamps, lumbar cushions, orthopedic car seats, transcutaneous electrical nerve stimulators ("TENS units"), electrical moist heating pads (known as thermophores), and whirlpool baths.

41. OD consists of instruments that are applied to the human body to align, support, or correct deformities, or to improve the movement of the spine, joints, or limbs. These devices come in direct contact with the outside of the body, and include such items as cervical collars (i.e., "whiplash" collars), lumbar supports, knee supports, ankle supports, wrist braces, and the like.

42. To ensure that Insureds' $50,000.00 in minimum No-Fault Benefits are not artificially depleted by inflated DME or OD charges, the maximum charges that may be submitted by healthcare providers for DME and OD are set forth in the New York Fee Schedule.

43. In a June 16, 2004 Opinion Letter entitled "No-Fault Fees for Durable Medical Equipment", the New York Insurance Department recognized the harm inflicted on Insureds by inflated DME and OD charges:

> [A]n injured person, with a finite amount of No-Fault benefits available, having assigned his rights to a provider in good faith, would have DME items of inflated fees constituting a disproportionate share of benefits, be deducted from the amount of the person's No-Fault benefits, resulting in less benefits available for other necessary health related services that are based upon reasonable fees.

44. As it relates to DME and OD, the New York State Workers' Compensation Board adopted the New York State Workers' Compensation Durable Medical Equipment Fee Schedule

("Fee Schedule") that became effective on April 4, 2022.

45. Among other things, the Fee Schedule limited the reimbursement rates of certain previously abused DME charges and established a maximum permissible charge for certain specifically listed pieces of DME ("Fee Schedule item"). The charges for the reimbursement of DME by the New York State Workers' Compensation Board are reflected in 12 N.Y.C.R.R. § 442.2 (2022).

46. Similarly, effective June 1, 2023, the New York State Department of Financial Services issued an amendment to 11 N.Y.C.R.R. 68, adding Part E of Appendix 17-C, to address No-Fault reimbursement for DME that is not specifically identified by the Fee Schedule ("Non-Fee Schedule item").

47. For Non-Fee Schedule items that are provided by a DME/OD supplier, the maximum permissible reimbursement rate is the lesser of: (1) the acquisition cost (i.e. the line item cost from a manufacturer or wholesaler net of any rebates, discounts or other valuable considerations, mailing, shipping, handling, insurance costs or any sales tax) to the provider plus 50%; or (2) the usual and customary price charged to the general public. See 11 N.Y.C.R.R. 68, Appendix 17-C, Part E.

48. For Fee Schedule items, Palmetto GBA, LLC ("Palmetto"), a contractor for the Center for Medicare & Medicaid Services ("CMS"), was tasked with analyzing and assigning HCPCS Codes that should be used by DME and OD companies to seek reimbursement for – among other things – Fee Schedule items. The HCPCS Codes and their definitions provide specific characteristics and requirements that an item of DME or OD must meet in order to qualify for reimbursement under a specific HCPCS Code.

49. For Non-Fee Schedule items, the New York State Insurance Department

recognized that a provider's acquisition cost must be limited to costs incurred by a provider in a "bona fide arms-length transaction" because "[t]o hold otherwise would turn the No-Fault reparations system on its head if the provision for DME permitted reimbursement for 150% of any documented cost that was the result of an improper or collusive arrangement." See New York State Insurance Department, No-Fault Fees for Durable Medical Equipment, June 16, 2004 Opinion Letter.

50. Additionally, many HCPCS Codes relate to OD that has either been prefabricated, custom-fitted, and/or customized. Palmetto published a guide to differentiating between custom-fitted items and off-the-shelf, prefabricated items, entitled, Correct Coding – Definitions Used for Off-the Shelf versus Custom Fitted Prefabricated Orthotics (Braces) – Revised. As part of its coding guide, Palmetto has identified who is qualified to properly provide custom-fitted OD.

51. Accordingly, when a healthcare provider submits a bill to collect charges from an insurer for DME or OD using either a NF-3 or HCFA-1500 form, the provider represents – among other things – that:

(i) The provider is in compliance with all significant statutory and regulatory requirements;

(ii) The provider received a legitimate prescription that was issued in accordance with the requirements of applicable laws and is for reasonable and medically necessary DME and/or OD from a healthcare practitioner that is licensed to issue such prescriptions;

(iii) The DME or OD identified in the bill was actually provided to the patient based upon a legitimate prescription;

(iv) The HCPCS Code identified in the bill actually represents the DME or OD that was provided to the patient; and

(v) The fee sought for the DME or OD provided to an Insured was not in excess of the price contained in the Fee Schedule or the standard used for a Non-Fee Schedule item.

## II. The Defendants' Fraudulent Scheme

### A. The DME Entities' Common Secret Ownership

52. The Secret Owner, Paper Owner Defendants, and John Doe Defendants conspired to design and implement a complex fraudulent scheme in which the DME Entities were used consecutively and in conjunction with each other between September and December 2025 to bill GEICO and other New York automobile insurers for millions of dollars in No-Fault Benefits to which they were not entitled to receive.

53. While each of the DME Entities were formed and listed as being owned by one of the Paper Owner Defendants, all of the DME Entities were actually controlled by the Secret Owner, who also profited from the fraudulent scheme committed against GEICO and other New York automobile insurers.

54. The Secret Owner was able to secretly control and profit from the DME Entities by using each of the Paper Owner Defendants as "straw" owners who would place their name on documents required to be filed with the State of New York and City of New York to lawfully operate the DME Entities.

55. In keeping with the fact that the Secret Owner actually owned, controlled, and profited from the DME Entities, and used the Paper Owner Defendants to further the fraudulent scheme herein, there is significant overlap in the operations of the various DME Entities that could only exist through the Secret Owner's involvement.

56. For example, the Secret Owner, together with the Paper Owner Defendants, operated the DME Entities in the following sequential fashion with limited overlap as part of a "quick hit" strategy to limit the amount of billing submitted from any one of the DME Entities and mask the common fraudulent scheme:

(i) Goni Supply billed GEICO for dates of service between September 2, 2025 and September 19, 2025;

(ii) Pro Health Supply billed GEICO for dates of service between September 19, 2025 and October 8, 2025;

(iii) Liga Supply billed GEICO for dates of service between September 29, 2025 and November 18, 2025; and

(iv) Curatech Supply billed GEICO for dates of service between December 1, 2025 and December 29, 2025.

57. In keeping with the fact that the DME Entities are actually controlled by the Secret Owner and were operated as part of a common scheme, each of the DME Entities used virtually the same delivery receipts in their supporting documentation to GEICO. For example:

GONI MEDICAL SUPPLY CORP
3203 QUENTIN RD
BROOKLYN, NY 11234

DELIVERY RECEIPT

Patient's Name [redacted] Accident Date : [redacted]
Patient's Address : [redacted] Street# Apartment#/Floor
City: [redacted] State: [redacted] Zip: [redacted] Phone: [redacted]
Sex: [redacted] DOB: [redacted]

Equipment Delivered
I have received following supplies

1. CERVICAL PILLOW
2. ELECTRIC HEAT PAD MOIST
3. LUMBAR CUSHION
4. LAMBAR-SACRAL ORTHOSIS SAGITAL CONTROL
5. BED BOARD
6. EGG CRATE MATTRESS

I, [redacted] ("Assignor")
(Print patient's name)
hereby assign to GONI MEDICAL SUPPLY CORP("Assignee") all rights privileges and remedies to payment for health care services provided by assignee to which I am entitled under Article 51 (the No-Fault statute) of the Insurance Law.

The Assignee hereby certifies that they have not received any payment from or on behalf of the Assignor and shall not pursue payment directly from the Assignor for services provided by said Assignee for injures sustained due to the motor vehicle accident which occured on 08/18/25, not withstanding any other agreement to the contrary.

This agreement may be revoked by the assignee when benefits are not payable based upon the assignor's lack of coverage and/or violation of a policy condition due to the actions or conduct of the assignor.

ANY PERSON WHO KNOWINGLY AND WITH INTENT TO DEFRAUD ANY INSURANCE COMPANY OR OTHER PERSON FILES AN APPLICATION FOR INSURANCE OR STATEMENT OF CLAIM CONTAINING ANY MATERIALLY FALSE INFORMATION, OR CONCEALS FOR THE PURPOSE OF MISLEADING, INFORMATION CONCERNING ANY FACT MATERIAL THERETO, COMMITS A FRAUDULENT INSURANCE ACT, WHICH IS A CRIME, AND SHALL ALSO BE SUBJECT TO A CIVIL PENALTY NOT TO EXCEED FIVE THOUSAND DOLLARS AND THE STATED VALUE OF THE CLAIM FOR EACH SUCH VIOLATION.

I FURTHER AUTHORIZE THE RELEASE OF MY MEDICAL RECORDS AND INFORMATION TO THE PROVIDER IN THE NYS FORM NF - AOB, ITS REPRESENTATI [redacted] AND SPECIFICALLY WAIVE ANY PRIVILIDGE THAT MAY BE ASSOCIATED THEREWITH.

(Signature of Patient) (Signature of Provider)
Date: 09/16/25
File # : GO 258

PRO HEALTH SUPPLY CORP
2558 EAST 17TH STREET
BROOKLYN, NY 11234

DELIVERY RECEIPT

Patient's Name : [redacted] Accident Date : [redacted]
Patient's Address : [redacted] Street# Apartment#/Floor
City: [redacted] State: [redacted] Zip: [redacted] Phone: [redacted]
Sex: [redacted] DOB: [redacted]

Equipment Delivered
I have received following supplies

1. E.M.S UNIT (4LEAD)
2. INFRARED LAMP(heat lamp w/stand)
3. MASSAGER

I, [redacted] ("Assignor")
(Print patient's name)
hereby assign to PRO HEALTH SUPPLY CORP("Assignee") all rights privileges and remedies to payment for health care services provided by assignee to which I am entitled under Article 51 (the No-Fault statute) of the Insurance Law.

The Assignee hereby certifies that they have not received any payment from or on behalf of the Assignor and shall not pursue payment directly from the Assignor for services provided by said Assignee for injures sustained due to the motor vehicle accident which occured on 05/23/25, not withstanding any other agreement to the contrary.

This agreement may be revoked by the assignee when benefits are not payable based upon the assignor's lack of coverage and/or violation of a policy condition due to the actions or conduct of the assignor.

ANY PERSON WHO KNOWINGLY AND WITH INTENT TO DEFRAUD ANY INSURANCE COMPANY OR OTHER PERSON FILES AN APPLICATION FOR INSURANCE OR STATEMENT OF CLAIM CONTAINING ANY MATERIALLY FALSE INFORMATION, OR CONCEALS FOR THE PURPOSE OF MISLEADING, INFORMATION CONCERNING ANY FACT MATERIAL THERETO, COMMITS A FRAUDULENT INSURANCE ACT, WHICH IS A CRIME, AND SHALL ALSO BE SUBJECT TO A CIVIL PENALTY NOT TO EXCEED FIVE THOUSAND DOLLARS AND THE STATED VALUE OF THE CLAIM FOR EACH SUCH VIOLATION.

I FURTHER AUTHORIZE THE RELEASE OF MY MEDICAL RECORDS AND INFORMATION TO THE PROVIDER IN THE NYS FORM NF - AOB, ITS REPRESE [redacted] GE THAT MAY BE ASSOCIATED THEREWITH.

(Signature of Provider)
Date: 09/29/25
File # : PR 20

LIGA MEDICAL SUPPLY CORP
2269 65TH STREET
BROOKLYN, NY 11204

DELIVERY RECEIPT

Patient's Name : [redacted] Accident Date : [redacted]
Patient's Address : [redacted] Street# Apartment#/Floor
City: [redacted] State: [redacted] Zip: [redacted] Phone: [redacted]
Sex: [redacted] DOB: [redacted]

Equipment Delivered
I have received following supplies
1. LSO APL CONTROL/CUSTOM FITTED

I, [redacted] ("Assignor")
(Print [redacted]'s name)
hereby assign to LIGA MEDICAL SUPPLY CORP("Assignee") all rights privileges and remedies to payment for health care services provided by assignee to which I am entitled under Article 51 (the No-Fault statute) of the Insurance Law.

The Assignee hereby certifies that they have not received any payment from or on behalf of the Assignor and shall not pursue payment directly from the Assignor for services provided by said Assignee for injures sustained due to the motor vehicle accident which occured on 08/18/25, not withstanding any other agreement to the contrary.

This agreement may be revoked by the assignee when benefits are not payable based upon the assignor's lack of coverage and/or violation of a policy condition due to the actions or conduct of the assignor.

ANY PERSON WHO KNOWINGLY AND WITH INTENT TO DEFRAUD ANY INSURANCE COMPANY OR OTHER PERSON FILES AN APPLICATION FOR INSURANCE OR STATEMENT OF CLAIM CONTAINING ANY MATERIALLY FALSE INFORMATION, OR CONCEALS FOR THE PURPOSE OF MISLEADING, INFORMATION CONCERNING ANY FACT MATERIAL THERETO, COMMITS A FRAUDULENT INSURANCE ACT, WHICH IS A CRIME, AND SHALL ALSO BE SUBJECT TO A CIVIL PENALTY NOT TO EXCEED FIVE THOUSAND DOLLARS AND THE STATED VALUE OF THE CLAIM FOR EACH SUCH VIOLATION.

I FURTHER AUTHORIZE THE RELEASE OF MY MEDICAL RECORDS AND INFORMATION TO THE PROVIDER IN THE NYS FORM NF - AOB, ITS REPRESENTATIVES, OR ASSIGNS AND SPECIFICALLY WAIVE ANY PRIVILIDGE THAT MAY BE ASSOCIATED THEREWITH.

[redacted] (Signature of Provider)
Date: 10/31/25

CURATECH MED SUPPLY INC
3000 OCEAN PARKWAY, APT. 19B
BROOKLYN, NY 11235

DELIVERY RECEIPT

Patient's Name : [redacted] Accident Date : [redacted]
Patient's Address : [redacted] Street# Apartment#/Floor
City: [redacted] State: [redacted] Zip: [redacted] Phone: [redacted]
Sex: [redacted] DOB: [redacted]

Equipment Delivered
I have received following supplies
1. CERVICAL TRACTION UNIT

I, [redacted] ("Assignor")
(Print patient's name)
hereby assign to CURATECH MED SUPPLY INC("Assignee") all rights privileges and remedies to payment for health care services provided by assignee to which I am entitled under Article 51 (the No-Fault statute) of the Insurance Law.

The Assignee hereby certifies that they have not received any payment from or on behalf of the Assignor and shall not pursue payment directly from the Assignor for services provided by said Assignee for injures sustained due to the motor vehicle accident which occured on 09/04/25, not withstanding any other agreement to the contrary.

This agreement may be revoked by the assignee when benefits are not payable based upon the assignor's lack of coverage and/or violation of a policy condition due to the actions or conduct of the assignor.

ANY PERSON WHO KNOWINGLY AND WITH INTENT TO DEFRAUD ANY INSURANCE COMPANY OR OTHER PERSON FILES AN APPLICATION FOR INSURANCE OR STATEMENT OF CLAIM CONTAINING ANY MATERIALLY FALSE INFORMATION, OR CONCEALS FOR THE PURPOSE OF MISLEADING, INFORMATION CONCERNING ANY FACT MATERIAL THERETO, COMMITS A FRAUDULENT INSURANCE ACT, WHICH IS A CRIME, AND SHALL ALSO BE SUBJECT TO A CIVIL PENALTY NOT TO EXCEED FIVE THOUSAND DOLLARS AND THE STATED VALUE OF THE CLAIM FOR EACH SUCH VIOLATION.

I FURTHER AUTHORIZE THE RELEASE OF MY MEDICAL RECORDS AND INFORMATION TO THE PROVIDER IN THE NYS FORM NF - AOB, ITS REPRESENTATIVES, OR ASSIGNS AND SPECIFICALLY WAIVE ANY PRIVILIDGE THAT MAY BE ASSOCIATED THEREWITH.

[redacted] (Signature of Provider)
Date: 12/22/25
File # : CU 591

58. Further, and discussed in more detail below, checks issued by GEICO that were made payable to the DME Entities were converted into cash at the same cashing facility located in New Jersey.

59. Relatedly, and as part of the common scheme, based on collusive arrangements between the Secret Owner, the Paper Owner Defendants, Clinic Controllers, and other John Doe Defendants, DME Entities would receive virtually identical prescriptions for Fraudulent Equipment from Clinics in the New York metropolitan area, including from the Clinics located at: (i) 2232 Kimball Street, Brooklyn, New York; (ii) 6937 Myrtle Avenue, Glendale, New York; (iii) 170-04 Henley Road, Jamaica, New York; and (iv) 2184 Flatbush Avenue, Brooklyn, New York.

60. Additionally, and as discussed further below, the DME Entities each billed GEICO using virtually identical HCPCS Codes in response to the virtually identical prescriptions for Fraudulent Equipment they received, and the DME Entities each made virtually identical coding

misrepresentations and reimbursement misrepresentations in their billing to GEICO.

**B. Overview of the Defendants' Common Fraudulent Scheme**

61. The Secret Owner, together with the Paper Owner Defendants, conceived and implemented a complex fraudulent scheme in which they used the DME Entities as vehicles to bill GEICO and other New York automobile insurers for millions of dollars in No-Fault Benefits which Defendants were not entitled to receive.

62. To maximize the amount of no-fault benefits Defendants could receive, the Secret Owner along with the Paper Owner Defendants, used the DME Entities in sequential fashion to divide the billing that they were submitting to no-fault insurance carriers, including GEICO.

63. In keeping with the fact that Defendants split up their billing in order to maximize the amount of no-fault benefits they could collect, the DME Entities operated in sequential order.

64. Through the complex multi-corporation scheme, the Secret Owner and the Paper Owner Defendants used the DME Entities to bill and collect No-Fault Benefits from GEICO and other automobile insurers that they were never entitled to collect. Specifically:

(i) Between September 2, 2025 and September 19, 2025, Goni Supply submitted more than $721,000.00 in fraudulent claims to GEICO, wrongfully obtained more than $173,000.00, and there is more than $365,000.00 in additional fraudulent claims that have yet to be adjudicated but for which Defendants continue to seek payment from GEICO;

(ii) Between September 19, 2025 and October 8, 2025, Pro Health Supply submitted more than $705,000.00 in fraudulent claims to GEICO, wrongfully obtained more than $209,000.00, and there is more than $280,000.00 in additional fraudulent claims that have yet to be adjudicated but for which Defendants continue to seek payment from GEICO;

(iii) Between September 29, 2025 and November 18, 2025, Liga Supply submitted more than $729,000.00 in fraudulent claims to GEICO, wrongfully obtained more than $366,000.00, and there is more than $305,000.00 in additional fraudulent claims that have yet to be adjudicated but for which Defendants continue to seek payment from GEICO; and

(iv) Between December 1, 2025 and December 29, 2025, Curatech Supply submitted more than $756,000.00 in fraudulent claims to GEICO, wrongfully obtained more than $280,000.00, and there is more than $440,000.00 in additional fraudulent claims that have yet to be adjudicated but for which Defendants continue to seek payment from GEICO.

65. The Defendants were able to perpetrate the fraudulent scheme against GEICO described below by obtaining illegitimate prescriptions for Fraudulent Equipment purportedly issued by the Referring Providers because of collusive agreements with the Clinic Controllers and other John Doe Defendants who are associated with the Clinics.

66. Notably, none of Defendants marketed or advertised the DME Entities to the general public, and they lacked any genuine retail or office location, and operated without any legitimate efforts to attract patients who might need DME or healthcare practitioners who might legitimately prescribe DME.

67. For example, the address associated with Goni Supply is a hardware store in Brooklyn, the address associated with Pro Health Supply is a monuments store that carves headstones for cemeteries, the address associated with Liga Supply is an automotive leasing business, and the address associated with Curatech Supply is a residential apartment.

68. Similarly, the Paper Owner Defendants did virtually nothing that would be expected of the owner of a legitimate DME supply company to develop its reputation in the medical community or to attract patients who might need DME or healthcare practitioners who might legitimately prescribe DME.

69. Instead, the Defendants entered into collusive agreements with the John Doe Defendants who were associated with both the Clinics and the Referring Providers whereby kickbacks and other financial incentives were paid so that Defendants would receive large volumes of prescriptions from the Referring Providers in relation to Insureds who were being treated at the

Clinics.

70. The prescriptions obtained by the Defendants for Fraudulent Equipment were never given to the Insureds to fill, but as part of the fraudulent scheme, they were routed directly to the Defendants at the direction of the Clinic Controllers to ensure that the Insureds did not attempt to fill the prescriptions with legitimate DME and OD retailers, who would likely question the legitimacy of the prescriptions, the volume of prescriptions, or the need for the DME/OD in the first instance.

71. The prescriptions obtained by the Defendants for Fraudulent Equipment included prescriptions for both Fee Schedule and Non-Fee Schedule items which the Defendants used (i) as a basis to purportedly provide and bill for whatever DME/OD the Defendants decided to dispense, not what was determined based upon a legitimate prescription by a licensed healthcare professional; (ii) to misrepresent the nature and quality of the items that they actually dispensed, so as to claim entitlement to a higher fee payable by automobile insurers like GEICO; and (iii) to misrepresent the maximum reimbursement rate they were entitled to receive for Non-Fee Schedule items.

72. As part of the scheme, the Clinic Controllers directed that the prescriptions issued by the Referring Providers should be written in a generic, vague, non-descript manner so that the DME Entities could have the flexibility to designate the products that would result in the highest forms of reimbursement from GEICO.

73. The Defendants then used the intentionally generic and vague prescriptions to unlawfully choose one of many variations of DME and/or OD that could be provided to the Insureds. As a result, in virtually every circumstance available, the DME Entities purported to provide the Insureds with a variation that had high – if not one of the highest – maximum

reimbursement rates under the applicable fee schedule.

74. In addition to unlawfully choosing specific types of Fraudulent Equipment to provide Insureds, each of Defendants engaged in a virtually identical pattern of submitting bills to GEICO seeking No-Fault Benefits based on HCPCS Codes that did not accurately represent – sometimes in any way – the Fraudulent Equipment purportedly provided to the Insureds in order to obtain higher reimbursement rates than what was permissible.

75. By submitting bills to GEICO seeking No-Fault Benefits for Fraudulent Equipment based upon specific HCPCS Codes, the DME Entities represented that they provided Insureds with the particular items associated with each unique HCPCS Code, and that such specific item was medically necessary as determined by a healthcare provider licensed to prescribe DME and/or OD.

76. However, to the extent that any Fraudulent Equipment was actually provided to Insureds, the Fraudulent Equipment did not match the HCPCS Codes identified in the bills submitted by the DME Entities.

77. Instead, to the extent that any Fraudulent Equipment was provided to the Insureds, Defendants provided Insureds with inexpensive and poor-quality Fraudulent Equipment, which did not contain all the features required by the HCPCS Codes identified in the bills submitted by the DME Entities.

78. The Fraudulent Equipment actually provided to Insureds – again to the extent that any Fraudulent Equipment was actually provided – were inexpensive and poor-quality items that only qualified under HCPCS Codes with significantly lower maximum reimbursement rates than the HCPCS Codes actually identified in the bills submitted by Defendants.

79. In furtherance of their scheme to defraud GEICO and other automobile insurers, Defendants also submitted bills for Non-Fee Schedule items that falsely indicated they were

seeking reimbursement at the lesser of 150% of Defendants' legitimate acquisition cost or the cost to the general public for the same item.

80. In actuality, the bills from Defendants submitted to GEICO for Non-Fee Schedule items contained grossly inflated reimbursement rates that did not accurately represent the lesser of 150% of Defendants' legitimate acquisition cost or the cost to the general public.

81. As a further part of this scheme, Defendants submitted bills to GEICO with reimbursement rates that indicated the Non-Fee Schedule items purportedly provided Insureds were expensive and high-quality, when the Fraudulent Equipment provided was cheap and poor-quality, and was purchased from wholesalers for a small fraction of the reimbursement rates contained in the bills.

82. In fact, the cheap and poor-quality Fraudulent Equipment provided to the Insureds – again, to the extent that any Fraudulent Equipment was actually provided – were easily obtainable from legitimate internet or brick-and-mortar retailers for a small fraction of the reimbursement rates identified in the bills submitted to GEICO by Defendants.

83. Each of the DME Entities made virtually identical fraudulent misrepresentations in the HCPCS Codes used and the reimbursement rates charged to GEICO that would have been impossible but for their participation in a common scheme and control by the Secret Owner, to be described in more detail below.

84. Further, in an effort to hide the extent of their fraudulent acts against GEICO, Defendants each also submitted multiple bills to GEICO for Fraudulent Equipment that was purportedly provided to Insureds on the same date.

85. The Defendants' submission of multiple bills to GEICO in this manner was in reality designed to further mask the fraudulent scheme and as part of an effort to keep the

individual totals on each bill lower artificially and avoid detection by GEICO.

86. After obtaining prescriptions for Fraudulent Equipment as a result of their collusive relationships with the Clinic Controllers and other John Doe Defendants, the Defendants in turn then billed GEICO for: (i) Fraudulent Equipment that was not reasonable nor medically necessary; (ii) Fraudulent Equipment that was not based on valid prescriptions from licensed healthcare providers; (iii) Fraudulent Equipment that did not represent the HCPCS codes contained in the bills to GEICO; and (iv) Fraudulent Equipment with inflated charges that far exceeded the value of the actual products they provided to GEICO's Insureds.

### C. The Fraudulent Scheme - Predetermined Fraudulent Protocols Associated with the Prescriptions

87. The Defendants were able to obtain prescriptions that could be used as a basis to submit bills to GEICO through predetermined fraudulent protocols that were established between and among the Defendants, the Clinic Controllers and other John Defendants, and the Referring Providers.

88. Through these predetermined fraudulent protocols, the Defendants obtained prescriptions for Fraudulent Equipment that were not medically necessary and were created solely to financially enrich the Defendants and John Doe Defendants, not to genuinely treat and/or benefit the Insureds.

89. As set forth below, the extent of the Insureds' motor vehicle accidents, physical conditions, and conservative treatment plans demonstrate a pattern of prescribing and dispensing Fraudulent Equipment to the Insureds that were not medically necessary to treat the Insureds post-accident condition.

90. Virtually all of the Insureds who were prescribed the Fraudulent Equipment identified in Exhibits "1" - "4" were involved in relatively minor and low-impact "fender-bender"

accidents, to the extent that they were involved in any actual accidents at all.

91. Concomitantly, almost none of the Insureds identified in Exhibits "1" - "4", whom the Referring Providers purported to treat, suffered from any significant injuries or health problems as a result of the relatively minor accidents they experienced or purported to experience.

92. In keeping with the fact that the Insureds identified in Exhibits "1" - "4" suffered only minor injuries – to the extent they had any injuries at all – as a result of the relatively minor accidents, many of the Insureds did not seek treatment at any hospital as a result of their accidents.

93. To the extent the Insureds in the claims identified in Exhibits "1" - "4" did seek treatment at a hospital following their accidents, they virtually always were briefly observed on an outpatient basis and then sent on their way with nothing more serious than a minor soft tissue injury, such as a sprain or strain.

94. However, despite virtually all of the Insureds being involved in relatively minor and low-impact accidents and only suffering from sprains and strains – to the extent that the Insureds were actually injured – virtually all of the Insureds were subject to extremely similar prescription protocols for numerous pieces of Fraudulent Equipment that were not medically necessary.

95. There are a substantial number of variables that can affect whether, how, and to what extent an individual is injured in an automobile accident.

96. For example, an individual's age, height, weight, general physical condition, location within the vehicle, and the location of the impact all will affect whether, how, and to what extent an individual is injured in a given automobile accident.

97. It is medically implausible that patients differing in age, height, weight, general physical condition, location within the vehicle, and pain location would all require the same

combination of Fraudulent Equipment prescribed on the same visit.

98. The uniformity of the Fraudulent Equipment prescribed is incompatible with individualized patient care and is evidence that independent clinical judgment was never exercised by the Referring Providers.

99. The prescriptions for Fraudulent Equipment that were purportedly issued to the Insureds identified in Exhibits "1" - "4" were issued pursuant to predetermined fraudulent protocols set forth at each Clinic, and not because the Fraudulent Equipment was medically necessary for each Insured based upon his or her individual symptoms or presentations.

100. For example, the predetermined fraudulent protocols at each Clinic (i) included issuing predetermined sets of Fraudulent Equipment that applied to virtually all Insureds, regardless of each Insured's individual symptoms or presentation, and (ii) were not based upon what was medically necessary for each patient. Instead, they were created based upon how the John Doe Defendants, and others including the Defendants, could profit from exploiting prescriptions purportedly issued by the Referring Providers.

101. In other words, no legitimate physician, chiropractor, other licensed healthcare provider, or professional entity would permit prescriptions for Fraudulent Equipment to be issued based upon the fraudulent protocols at the various Clinics that were the prescription sources for the Defendants.

102. In a legitimate setting, when a patient injured in a motor vehicle accident seeks treatment from a healthcare provider, the patient's subjective complaints are evaluated, and the treating provider will direct a specific course of treatment based upon the patients' individual symptoms or presentation. This individualized assessment should include the patient's history, mechanism of injury, pain complaints, physical examination findings, functional limitations,

ability to ambulate and perform activities of daily living, and response to any prior conservative treatment.

103. Furthermore, for uncomplicated post-accident sprain/strain complaints without fracture, neurologic deficit, instability, or major functional loss, the usual initial approach includes education, activity modification, medication when appropriate, and active conservative rehabilitation. Extensive passive bundles of DME/OD are not the usual or expected initial treatment pathway absent specific documented findings.

104. In the event that conservative treatments fail to adequately improve the patient's condition, then in determining whether to prescribe DME/OD to a patient – in a legitimate setting – a healthcare provider should evaluate multiple factors, including: (i) a functional assessment of the patient's physical limitations; (ii) whether the specific DME/OD could have any negative effects based upon the patient's physical condition and medical history; (iii) whether the DME/OD is likely to help improve the patient's complained of condition; (iv) whether the patient is likely to use the DME/OD; and (v) anticipated duration of use of the DME/OD. In all circumstances, any prescribed DME/OD would always directly relate to each patient's individual diagnostic condition.

105. If a healthcare provider determines that DME/OD is medically necessary after considering a patient's individual circumstances and situations, in a legitimate setting, the healthcare provider would document in a contemporaneous medical record, such as an evaluation report, what specific DME/OD was prescribed, why it was medically necessary, how it would help the patient, and what the individualized treatment goals are for the patient in using the prescribed DME/OD.

106. Further, in a legitimate setting, when a patient returns for an examination after being prescribed DME/OD, the healthcare provider would inquire – and appropriately report – whether

the previously prescribed DME/OD aided the patient's subjective pain complaints, improved physical function, and if there were any impediments to the proper use of the DME/OD. Such information is typically addressed so the healthcare provider can recommend a further course of treatment regarding the previously prescribed DME/OD or newly issued DME/OD.

107. It is improbable – to the point of an impossibility – that virtually all of the Insureds identified in Exhibits "1" - "4" who were treated at a specific Clinic would receive virtually identical prescriptions for numerous items of Fraudulent Equipment, despite being different ages, in different physical conditions, and involved in different motor vehicle accidents.

108. It is even more improbable – to the point of impossibility – that virtually all of the Insureds identified in Exhibits "1" - "4" who were treated by different Referring Providers at a specific Clinic would receive virtually identical prescriptions for numerous items of Fraudulent Equipment despite being different ages, in different physical conditions, and involved in different motor vehicle accidents.

109. Here, and in keeping with the fact that the prescriptions provided to the Defendants were for medically unnecessary Fraudulent Equipment obtained as part of an insurance scheme in which there were predetermined fraudulent protocols, virtually all of the Insureds identified in Exhibits "1" - "4" that were treated at a specific Clinic were issued virtually identical prescriptions for a predetermined set of Fraudulent Equipment, despite being different ages, in different physical conditions, and involved in different motor vehicle accidents.

110. To the extent that there was a contemporaneously dated evaluation report, the evaluation report virtually always failed to explain – and oftentimes failed to identify – the Fraudulent Equipment identified on the prescriptions provided to the Defendants and used by the Defendants to bill GEICO for the charges identified in Exhibits "1" - "4".

111. As part of the scheme established between the Defendants and John Doe Defendants associated with the Clinics, Referring Providers issued repeated prescriptions to Insureds for Fraudulent Equipment that falls well outside the generally accepted medical guidelines for the treatment of the types of soft-tissue injuries sustained by the Insureds in Exhibits "1" – "4" as a result of their underlying automobile accidents.

112. Virtually none of the Insureds identified in Exhibits "1" – "4" were afforded sufficient time for the natural course of healing to resolve their soft tissue injuries, as would be expected following the types of injuries sustained from their underlying automobile accidents to the extent they were even injured at all.

113. For the reasons set forth above, and below, in each of the claims identified in Exhibits "1" - "4", the Defendants falsely represented that the Fraudulent Equipment was provided pursuant to legitimate prescriptions from healthcare providers for medically necessary DME or OD, and were, therefore, entitled to collect No-Fault Benefits in the first instance, when, in fact, the prescriptions were for medically unnecessary Fraudulent Equipment issued as part of the Defendants' insurance fraud scheme.

**1. Collusive Arrangements to Obtain Illegitimate and Medically Unnecessary Prescriptions**

114. To gain access to Insureds so that they could implement and execute their fraudulent scheme and maximize the amount of No-Fault Benefits that could be obtained from GEICO and other New York automobile insurers, the Defendants entered into collusive agreements with the Clinic Controllers and other John Doe Defendants in order to procure and direct prescriptions to the DME Entities that were illegitimate and for medically unnecessary Fraudulent Equipment.

115. Since the inception of the DME Entities, the Defendants engaged in various

collusive arrangements with the Clinic Controllers and other John Doe Defendants pursuant to which Defendants paid kickbacks or other financial incentives in exchange for being provided prescriptions to fill from the Referring Providers for the Fraudulent Equipment that could then be used by the Defendants to support their charges to GEICO and other New York automobile insurers. The improper financial arrangements were key to the fraudulent scheme in that they allowed the Defendants to submit hundreds of charges for Fraudulent Equipment to GEICO and other New York automobile insurers. However, the collusive nature of the arrangement goes beyond the simple payment of money or other financial incentives, but includes (i) payment to fictitious businesses associated with the John Doe Defendants, (ii) the ability to secure the prescriptions without ever meeting the Referring Providers, (iii) obtaining the prescriptions directly from the staff at the Clinics, without any communication or involvement by the Insureds, and (iv) providing the Fraudulent Equipment to the Clinic and its staff, without any interaction with the Insureds.

116. The collusive arrangements allowed the scheme to remain undetected by the Insureds and allowed the Defendants to access large volumes of prescriptions that in turn afforded them the opportunity to submit charges for thousands of dollars in Fraudulent Equipment for each Insured to GEICO and other automobile insurers. But for the collusive arrangements, neither the John Doe Defendants nor the Referring Providers would have had any reason to direct a substantial volume of these medically unnecessary prescriptions for Fraudulent Equipment to the DME Entities to purportedly fill.

117. For example, as a result of these collusive relationships, Liga Supply began receiving prescriptions from the Clinics and billing GEICO for Fraudulent Equipment 22 days before they were ever incorporated.

118. There is no legitimate reason for Liga Supply to have received prescriptions from the Clinics and submitted billing to GEICO weeks before they were ever incorporated and existed as a business.

119. Upon information and belief, the Referring Providers were compensated by the Clinic Controllers or other John Doe Defendants, whether financially or through some other economic quid pro quo (e.g. the ability to treat the Insureds and independently bill GEICO), for the Referring Providers' willingness to permit prescriptions to be issued in their names and to be given to DME suppliers, including the DME Entities, rather than given to the Insureds or to a bona-fide DME/OD retailer, who would likely question its legitimacy.

120. The collusive relationship between the Defendants and John Doe Defendants in relation to the prescriptions, issued without a specific disclosure to the patient of the financial relationship between the Referring Provider and the DME Entity, are the very kind of arrangements that are prohibited by N.Y. Public Health Law § 238-d. No such disclosures required by Public Health Law § 238-d were ever made to the Insureds identified in Exhibits "1"– "4". Rather, because of the nefarious nature of the relationship between the Defendants and the John Doe Defendants, the arrangements between and among the Defendants, John Doe Defendants, and Referring Providers were concealed from the Insureds.

121. As a result of these collusive relationships, the Defendants (rather than the Insured or a bona-fide DME /OD retailer) were given the illegitimate prescriptions, which (i) were for medically unnecessary Fraudulent Equipment that was not based upon each Insured's individual need; (ii) contained a photocopied signature of the Referring Provider; (iii) were undated; (iv) did not contain the name of the Referring Provider who issued the prescription; and/or (vi) were issued on a date the Referring Provider did not treat or otherwise examine the Insured.

122. Further illustrative of the fact that the collusive relationships between the Defendants, Clinic Controllers, and other John Doe Defendants were designed to obtain illegitimate prescriptions for Insureds who were treating at the Clinics, the Defendants received repeated prescriptions from the Clinics that contained photocopied signatures of the Referring Providers.

123. Once in receipt of these photocopied prescriptions, the Defendants then used these prescriptions as the basis to submit billing to GEICO for Fraudulent Equipment, such as the following representative examples:

<u>Stephen Brune, D.C. Photocopied Prescriptions from the<br>2232 Kimball St., Brooklyn, NY Clinic</u>

| **Example** | **Sample photocopied signatures** |
|---|---|
| Prescription for Insured JN dated 8/8/2025 used by **Goni Supply** as the basis to submit billing to GEICO. | <br>PROVIDER INFO: DATE: 08\|08\|25<br>PROVIDER'S NAME: Stephen Brune, DC<br>PROVIDER'S ADDRESS: 2232 Kimball street<br>CITY: Brooklyn STATE: NY ZIP: 11234<br>PROVIDER'S PHONE: (___)<br>PROVIDER'S SIGNATURE: SB |
| Prescription for Insured WD dated 8/8/2025 used by **Liga Supply** as the basis to submit billing to GEICO. | <br>PROVIDER INFO: DATE: 08\|08\|25<br>PROVIDER'S NAME: Stephen Brune, DC<br>PROVIDER'S ADDRESS: 2232 Kimball street<br>CITY: Brooklyn STATE: NY ZIP: 11234<br>PROVIDER'S PHONE: (___)<br>PROVIDER'S SIGNATURE: SB |
| Prescription for Insured WS dated 9/12/2025 used by **Pro Health Supply** as the basis to submit billing to GEICO. | <br>PROVIDER INFO: DATE: 9\|12\|25<br>PROVIDER'S NAME: Stephen Brune, DC<br>PROVIDER'S ADDRESS: 2232 Kimball street<br>CITY: Brooklyn STATE: NY ZIP: 11234<br>PROVIDER'S PHONE: (___)<br>PROVIDER'S SIGNATURE: SB |

| | |
|---|---|
| Prescription for Insured JR dated 10/31/2025 used by **Curatech Supply** as the basis to submit billing to GEICO. | <br>PROVIDER INFO: DATE: 10/31/25<br>PROVIDER'S NAME: Stephen Brune, DC<br>PROVIDER'S ADDRESS: 2232 Kimball Street<br>CITY: Brooklyn STATE: NY ZIP: 11234<br>PROVIDER'S PHONE: ( )<br>PROVIDER'S SIGNATURE: |

124. These are only representative examples.

125. The Defendants were able to obtain these illegitimate prescriptions for Fraudulent Equipment due to their collusive arrangements with the Clinic Controllers and other John Doe Defendants at each of the Clinics, which gave them access to the illegitimate prescriptions.

126. To that end, multiple checks issued by GEICO to the DME Entities were cashed at Cambridge Clarendon Financial Service d/b/a Market Street Check Cashing located in New Jersey, resulting in tens of thousands of dollars of insurance checks converted into cash.

127. There is no legitimate reason why the DME Entities would each use the same check cashing facility to cash reimbursement checks issued by GEICO as opposed to depositing the checks in a corporate bank account, let alone using a check cashing facility located in New Jersey when all of the Paper Owners are residents of New York and are allegedly doing most of their business in New York.

128. Instead, the checks issued by GEICO (and likely other automobile insurers) were converted into cash as a way to pay kickbacks to the Clinic Controllers and other John Doe Defendants associated with the Clinics as part of the common scheme to procure the medically unnecessary prescriptions for Fraudulent Equipment.

129. In contrast to bona fide DME/OD retailers, the Defendants were willing to obtain illegitimate prescriptions through collusive arrangements and submit the illegitimate prescriptions

to support their charges to GEICO and other automobile insurers.

130. These Clinics included but were not limited to: (i) 2232 Kimball Street, Brooklyn, New York; (ii) 6937 Myrtle Avenue, Glendale, New York; (iii) 170-04 Henley Road, Jamaica, New York; and (iv) 2184 Flatbush Avenue, Brooklyn, New York.

131. Although ostensibly organized to provide a range of healthcare services to Insureds at a single location, many of the Clinics operate under the unlawful ownership and control of unlicensed laypersons, with a revolving door of healthcare providers providing treatment to the Insureds and other patients without any continuity of care.

132. In fact, GEICO has received billing from many of the Clinics from an ever-changing number of healthcare providers, starting and stopping operations without any purchase or sale of a “practice”; without any legitimate transfer of patient care from one professional to another; and without any legitimate reason for the change in provider name, beyond circumventing insurance company investigations and continuing the fraudulent exploitation of New York’s No-Fault insurance system.

133. Unlicensed laypersons, rather than the healthcare professionals working in the Clinics, created and controlled the patient base at the Clinics, and directed fraudulent protocols used to maximize profits for the generation of revenue for their own benefit and the benefit of those with whom they are associated without regard to actual patient care.

### 2. The Predetermined Fraudulent Prescription Protocol at the Clinics

134. Through their collusive arrangements with the John Doe Defendants, Defendants were able to obtain medically unnecessary and otherwise illegitimate prescriptions for Fraudulent Equipment purportedly issued by a variety of Referring Providers who purported to treat Insureds at the Clinics pursuant to predetermined fraudulent protocols, which serves to further illustrate

Defendants' fraudulent scheme.

135. The Insureds identified in Exhibits "1" - "4" that were prescribed Fraudulent Equipment from the Clinics were typically involved in minor "fender-bender" motor vehicle accidents and then purportedly treated by a variety of healthcare providers at the Clinics.

136. However, during the course of their treatment at the Clinics, the Insureds were regularly prescribed Fraudulent Equipment that was medically unnecessary, not supported by medical records, and was issued pursuant to predetermined fraudulent protocols.

137. The Defendants' control by the Secret Owner, scheme to shift billing from one DME Entity to the next, and collusion with the Clinic Controllers and other John Doe Defendants associated with the Clinics for access to the Clinics' predetermined, fraudulent protocols for the prescription of Fraudulent Equipment is illustrated by the protocols employed at the Clinic located at 2232 Kimball St., Brooklyn, New York (the "Kimball St. Clinic"), which is representative of the fraudulent protocols more broadly employed.

138. Regardless of the type of motor vehicle accident, the age of each patient, each patient's physical condition, each patient's subjective complaints, or whether each patient would actually use the Fraudulent Equipment, the Referring Providers purportedly prescribed, at a minimum, the following Fraudulent Equipment to virtually every Insured identified in Exhibits "1" – "4" who treated at the Kimball St. Clinic: (i) "Water Circulation Unit"; (ii) "LSO"; (iii) "Thermophore"; (iv) "Egg Crate Mattress"; (v) "Bed Board"; (vi) "Cervical Pillow"; and (vii) "Lumbar Cushion".

139. In addition, the Referring Providers would also routinely purportedly prescribe one or more separate additional prescriptions to Insureds for the following Fraudulent Equipment: (i) "LSO APL Custom Fitted"; (ii) "Cervical Traction Unit w/ Pump"; (iii) "Shoulder"; (v) "Knee

Support Custom Fitted"; (vi) "Wearable PEMF [Pulsed Electromagnetic Field] Device"; (vii) "Orthopedic Position Seat".

140. To the extent that Insureds returned to the Kimball St. Clinic for follow-up examinations, the Referring Providers purportedly prescribed the following Fraudulent Equipment to virtually every Insured identified in Exhibits "1" – "4": (i) "Whirlpool"; (ii) "Infrared Lamp"; (iii) "Massager"; and (iv) "EMS (4 leads)".

141. Further, Insureds were also routinely provided with prescriptions for other types of Fraudulent Equipment that were purportedly provided by other medical supply companies.

142. Oftentimes, these prescriptions for Fraudulent Equipment were duplicative of prescriptions for DME/OD previously issued by Referring Providers that were sent to other DME suppliers.

143. As a result of these protocols, Insureds in some instances were prescribed over 20 different pieces of medically unnecessary DME/OD, including the Fraudulent Equipment that was purportedly provided by the Defendants.

144. The prescriptions purportedly issued by Referring Providers at the Kimball St. Clinic (which are representative of the types of prescriptions issued at all of the Clinics) were not based upon legitimate examinations by the Referring Providers that evaluated each Insured's individual symptom or presentation and determined whether and what type of DME and/or OD to provide.

145. Rather, these prescriptions were based upon a predetermined fraudulent protocol established by the Clinic Controllers and other John Doe Defendants and were obtained by the Defendants through improper financial arrangements with the Clinic Controllers and other John Doe Defendants.

146. Furthermore, the initial examination or follow-up examination reports, to the extent that there were contemporaneously dated examination reports, did not accurately identify the Fraudulent Equipment purportedly prescribed to the Insureds. In fact, the reports did not contain sufficient information describing the medical necessity of the prescribed Fraudulent Equipment.

147. Even more, the follow-up examination reports from the Referring Providers at the Kimball St. Clinic failed to include any meaningful information regarding the Insureds' use of the previously prescribed Fraudulent Equipment, to the extent it was even mentioned at all.

148. Further illustrative of the fact that the Insureds identified in Exhibits "1" – "4" that were treated at the Kimball St. Clinic were prescribed Fraudulent Equipment pursuant to predetermined fraudulent protocols, the Insureds were frequently purportedly issued prescriptions by Referring Providers for a variety of Fraudulent Equipment on days that the Referring Provider did not examine or otherwise treated the Insureds.

149. The predetermined fraudulent protocols related to the prescriptions issued and the Defendants' common scheme to shift the billing from one DME Entity to the next are illustrated by the following examples:

(i) On August 28, 2025, an Insured named DB was purportedly involved in a motor vehicle accident and thereafter purportedly started treatment at the Kimball St. Clinic. On September 3, 2025, Natalia Feldman, N.P. ("Feldman") purportedly issued a prescription in the name of DB, despite not examining or otherwise treating DB on that date, for:

| **Item(s) Prescribed** | **Prescription Provided to:** |
|---|---|
| Water Circulation Unit<br>LSO<br>Thermophore<br>Egg Crate Mattress<br>Bed Board<br>Cervical Pillow<br>Lumbar Cushion<br>Knee Support - L | **Goni Supply** |

On September 12, 2025, Stephen Brune, D.C. ("Brune") purportedly issued a prescription in the name of DB for:

| **Item(s) Prescribed** | **Prescription Provided to:** |
|---|---|
| Osteogenesis Stimulator | Non-Defendant DME supplier |

On September 19, 2025, Brune purportedly issued three separate prescriptions in the name of DB for:

| | **Item(s) Prescribed** | **Prescription Provided to:** |
|---|---|---|
| 1 | Wearable PEMF Device | **Pro Health Supply** |
| 2 | Pneumatic Compression Device | Non-Defendant DME supplier |
| 3 | Powered Pressure-Reducing Air Mattress | Non-Defendant DME supplier |

On September 29, 2025, Brune purportedly issued a prescription in the name of DB, despite not examining or otherwise treating DB on that date, for:

| **Item(s) Prescribed** | **Prescription Provided to:** |
|---|---|
| Orthopedic Position Seat | Non-Defendant DME supplier |

On October 1, 2025, after an examination with Feldman, Feldman purportedly issued a prescription in the name of DB for:

| **Item(s) Prescribed** | **Prescription Provided to:** |
|---|---|
| Whirlpool<br>Infrared Lamp<br>Massager<br>EMS (4 Leads) | **Liga Supply** |

On October 3, 2025, Feldman purportedly issued two separate prescriptions in the name of DB, despite not examining or otherwise treating DB on that date, for:

| | **Item(s) Prescribed** | **Prescription Provided to:** |
|---|---|---|
| 1 | Knee Support Custom Fitted – R | **Liga Supply** |
| 2 | LSO APL Custom Fitted | **Liga Supply** |

(ii) On August 31, 2025, an Insured named JJ was purportedly involved in a motor vehicle accident and thereafter purportedly started treatment at the Kimball St. Clinic. After an initial examination with Feldman on September 3, 2025, Feldman purportedly issued a prescription in the name of JJ for:

| **Item(s) Prescribed** | **Prescription Provided to:** |
|---|---|
| Water Circulation Unit<br>LSO<br>Thermophore<br>Egg Crate Mattress<br>Bed Board<br>Cervical Pillow<br>Lumbar Cushion<br>Knee Support - L | **Goni Supply** |

On September 12, 2025, Brune purportedly issued a prescription in the name of JJ, despite not examining or otherwise treating JJ on that date, for:

| **Item(s) Prescribed** | **Prescription Provided to:** |
|---|---|
| Pneumatic Compression Device<br>Wearable PEMF Device<br>Ultrasound Therapy Device<br>Power Pressure-Reducing Air Mattress | Non-Defendant DME supplier |

On September 19, 2025, Feldman purportedly issued a prescription in the name of JJ, despite not examining or otherwise treating JJ on that date, for:

| **Item(s) Prescribed** | **Prescription Provided to:** |
|---|---|
| Shoulder – L | **Pro Health Supply** |

Also on September 19, 2025, Brune purportedly issued a prescription in the name of JJ, despite not examining or otherwise treating JJ on that date, for:

| **Item(s) Prescribed** | **Prescription Provided to:** |
|---|---|
| Orthopedic Position Seat | Non-Defendant DME supplier |

On October 1, 2025, after an examination with Feldman, Feldman purportedly issued a prescription in the name of JJ for:

| **Item(s) Prescribed** | **Prescription Provided to:** |
|---|---|
| Whirlpool<br>Infrared Lamp<br>Massager<br>EMS (4 Leads) | **Liga Supply** |

On October 6, 2025, Feldman purportedly issued a prescription in the name of JJ, despite not examining or otherwise treating JJ on that date, for:

| **Item(s) Prescribed** | **Prescription Provided to:** |
|---|---|
| LSO APL Custom Fitted | **Liga Supply** |

(iii) On September 4, 2025, an Insured named CO was purportedly involved in a motor vehicle accident and thereafter purportedly started treatment at the Kimball St. Clinic. After an initial examination with Feldman on September 8, 2025, Feldman purportedly issued a prescription in the name of CO for:

| **Item(s) Prescribed** | **Prescription Provided to:** |
|---|---|
| Water Circulation Unit<br>LSO<br>Thermophore<br>Egg Crate Mattress<br>Bed Board<br>Cervical Pillow<br>Lumbar Cushion<br>Knee Support - R | **Goni Supply** |

On September 17, 2025, Feldman purportedly issued a prescription in the name of CO, despite not examining or otherwise treating CO on that date, for:

| **Item(s) Prescribed** | **Prescription Provided to:** |
|---|---|
| Shoulder – R | **Pro Health Supply** |

On September 19, 2025, Brune purportedly issued five separate prescriptions in the name of CO for:

| | **Item(s) Prescribed** | **Prescription Provided to:** |
|---|---|---|
| 1 | Wearable PEMF Device | **Pro Health Supply** |
| 2 | Pneumatic Compression Device | Non-Defendant DME supplier |
| 3 | Powered Pressure-Reducing Air Mattress | Non-Defendant DME supplier |
| 4 | Cold Compression Therapy System | Non-Defendant DME supplier |
| 5 | Orthopedic Position Seat | Non-Defendant DME supplier |

On October 8, 2025, after an examination with Feldman, Feldman purportedly issued a prescription in the name of CO for:

| **Item(s) Prescribed** | **Prescription Provided to:** |
|---|---|
| Whirlpool<br>Infrared Lamp<br>Massager<br>EMS (4 Leads) | **Liga Supply** |

On October 10, 2025, Feldman purportedly issued a prescription in the name of CO, despite not examining or otherwise treating CO on that date, for:

| **Item(s) Prescribed** | **Prescription Provided to:** |
|---|---|
| Cervical Traction Unit w/ Pump | **Liga Supply** |

On October 24, 2025, Feldman purportedly issued a prescription in the name of CO, despite not examining or otherwise treating CO on that date, for:

| **Item(s) Prescribed** | **Prescription Provided to:** |
|---|---|
| LSO APL Custom Fitted | **Liga Supply** |

(iv) On August 11, 2025, an Insured named MM was purportedly involved in a motor vehicle accident and thereafter purportedly started treatment at the Kimball St. Clinic. After an initial examination with Feldman on September 10, 2025, Feldman purportedly issued a prescription in the name of MM for:

| **Item(s) Prescribed** | **Prescription Provided to:** |
|---|---|
| Water Circulation Unit<br>LSO<br>Thermophore<br>Egg Crate Mattress<br>Bed Board<br>Cervical Pillow<br>Lumbar Cushion<br>Knee Support - L | **Pro Health Supply** |

On September 12, 2025, Brune purportedly issued a prescription in the name of MM, despite not examining or otherwise treating MM on that date, for:

| **Item(s) Prescribed** | **Prescription Provided to:** |
|---|---|
| Orthopedic Position Seat | Non-Defendant DME supplier |

On September 19, 2025, Brune purportedly issued a prescription in the name of MM, despite not examining or otherwise treating MM on that date, for:

| **Item(s) Prescribed** | **Prescription Provided to:** |
|---|---|
| Cold Compression Therapy System | Non-Defendant DME supplier |

On September 26, 2025, Brune purportedly issued a prescription in the name of MM, despite not examining or otherwise treating MM on that date, for:

| **Item(s) Prescribed** | **Prescription Provided to:** |
|---|---|
| Osteogenesis Stimulator | Non-Defendant DME supplier |

(v) On September 15, 2025, an Insured named DS was purportedly involved in a motor vehicle accident and thereafter purportedly started treatment at the Kimball St. Clinic. After an initial examination with Feldman on September 19, 2025, Feldman purportedly issued a prescription in the name of DS for:

| **Item(s) Prescribed** | **Prescription Provided to:** |
|---|---|
| Water Circulation Unit<br>LSO | **Pro Health Supply** |

| | |
|---|---|
| Thermophore<br>Egg Crate Mattress<br>Bed Board<br>Cervical Pillow<br>Lumbar Cushion<br>Knee Support - L | |

On September 26, 2025, Brune purportedly issued a prescription in the name of DS for:

| **Item(s) Prescribed** | **Prescription Provided to:** |
|---|---|
| Pneumatic Compression Device<br>Wearable PEMF Device<br>Ultrasound Therapy Device<br>Power Pressure-Reducing Air Mattress | Non-Defendant DME supplier |

On September 26, 2025, Brune purportedly issued six separate prescriptions, including duplicate prescriptions for multiple items, in the name of DS for:

| | **Item(s) Prescribed** | **Prescription Provided to:** |
|---|---|---|
| 1 | Pneumatic Compression Device | Non-Defendant DME supplier |
| 2 | Powered Pressure-Reducing Air Mattress | Non-Defendant DME supplier |
| 3 | Cold Compression Therapy System | Non-Defendant DME supplier |
| 4 | Cold Compression Therapy System | Non-Defendant DME supplier |
| 5 | Orthopedic Position Seat | Non-Defendant DME supplier |
| 6 | Orthopedic Position Seat | Non-Defendant DME supplier |

On October 14, 2025, Feldman purportedly issued a prescription in the name of DS, despite not examining or otherwise treating DS on that date, for:

| **Item(s) Prescribed** | **Prescription Provided to:** |
|---|---|
| Shoulder – R | **Liga Supply** |

On October 15, 2025, after an examination with Feldman, Feldman purportedly issued a prescription in the name of DS for:

| **Item(s) Prescribed** | **Prescription Provided to:** |
|---|---|
| Whirlpool | **Liga Supply** |

| | |
|---|---|
| Infrared Lamp<br>Massager<br>EMS (4 Leads) | |

On October 17, 2025, Brune purportedly issued a prescription in the name of DS for:

| **Item(s) Prescribed** | **Prescription Provided to:** |
|---|---|
| Ultrasound Therapy | Non-Defendant DME supplier |

On October 22, 2025, Feldman purportedly issued two separate prescriptions in the name of DS, despite not examining or otherwise treating DS on that date, for:

| | **Item(s) Prescribed** | **Prescription Provided to:** |
|---|---|---|
| 1 | Knee Support Custom Fitted – L | **Liga Supply** |
| 2 | Knee Support Custom Fitted – R | **Liga Supply** |

On November 10, 2025, Feldman purportedly issued a prescription in the name of DS, despite not examining or otherwise treating DS on that date, for:

| **Item(s) Prescribed** | **Prescription Provided to:** |
|---|---|
| LSO APL Custom Fitted | **Curatech Supply** |

(vi) On October 3, 2025, an Insured named JR was purportedly involved in a motor vehicle accident and thereafter purportedly started treatment at the Kimball St. Clinic. After an initial examination with Feldman on October 8, 2025, Feldman purportedly issued a prescription in the name of JR for:

| **Item(s) Prescribed** | **Prescription Provided to:** |
|---|---|
| Water Circulation Unit<br>LSO<br>Thermophore<br>Egg Crate Mattress<br>Bed Board<br>Cervical Pillow<br>Lumbar Cushion<br>Knee Support - L | **Liga Supply** |

On October 24, 2025, Brune purportedly issued three separate prescriptions in the name of JR, despite not examining or otherwise treating JR on that date, for:

| | **Item(s) Prescribed** | **Prescription Provided to:** |
|---|---|---|
| 1 | Orthopedic Position Seat | Non-Defendant DME supplier |
| 2 | Ultrasound Therapy Device | Non-Defendant DME supplier |
| 3 | Cold Compression Therapy System | Non-Defendant DME supplier |

On October 31, 2025, Brune purportedly issued a prescription in the name of JR, despite not examining or otherwise treating JR on that date, for:

| **Item(s) Prescribed** | **Prescription Provided to:** |
|---|---|
| Wearable PEMF Device | **Curatech Supply** |

On November 3, 2025, Feldman purportedly issued a prescription in the name of JR, despite not examining or otherwise treating JR on that date, for:

| **Item(s) Prescribed** | **Prescription Provided to:** |
|---|---|
| Shoulder - L | **Curatech Supply** |

On November 21, 2025, Brune purportedly issued two separate prescriptions in the name of JR, despite not examining or otherwise treating JR on that date, for:

| | **Item(s) Prescribed** | **Prescription Provided to:** |
|---|---|---|
| 1 | Pneumatic Compression Device | Non-Defendant DME supplier |
| 2 | Powered Pressure-Reducing Air Mattress | Non-Defendant DME supplier |

On November 26, 2025, after an examination with Feldman, Feldman purportedly issued a prescription in the name of JR for:

| **Item(s) Prescribed** | **Prescription Provided to:** |
|---|---|
| Whirlpool<br>Infrared Lamp<br>Massager<br>EMS (4 Leads) | Non-Defendant DME supplier |

(vii) On October 7, 2025, an Insured named JE was purportedly involved in a motor vehicle accident and thereafter purportedly started treatment at the Kimball St. Clinic. On October 10, 2025, Feldman purportedly issued a prescription in the name of JE, despite not examining or otherwise treating JE on that date, for:

| **Item(s) Prescribed** | **Prescription Provided to:** |
|---|---|
| Water Circulation Unit<br>LSO<br>Thermophore<br>Egg Crate Mattress<br>Bed Board<br>Cervical Pillow<br>Lumbar Cushion<br>Knee Support - L | **Liga Supply** |

On October 17, 2025, Brune purportedly issued three separate prescriptions in the name of JE, despite not examining or otherwise treating JE on that date, for:

| | **Item(s) Prescribed** | **Prescription Provided to:** |
|---|---|---|
| 1 | Orthopedic Position Seat | Non-Defendant DME supplier |
| 2 | Ultrasound Therapy Device | Non-Defendant DME supplier |
| 3 | Cold Compression Therapy System | Non-Defendant DME supplier |

On October 24, 2025, Feldman purportedly issued a prescription in the name of JE, despite not examining or otherwise treating JE on that date, for:

| **Item(s) Prescribed** | **Prescription Provided to:** |
|---|---|
| Knee Support Custom Fitted | **Liga Supply** |

On October 31, 2025, Brune purportedly issued a prescription in the name of JE for:

| **Item(s) Prescribed** | **Prescription Provided to:** |
|---|---|
| Wearable PEMF Device | **Curatech Supply** |

(viii) On October 21, 2025, an Insured named VB was purportedly involved in a motor vehicle accident and thereafter purportedly started treatment at the Kimball St. Clinic. After an initial examination with Feldman on October 22, 2025, Feldman purportedly issued a prescription in the name of VB for:

| **Item(s) Prescribed** | **Prescription Provided to:** |
|---|---|
| Water Circulation Unit<br>LSO<br>Thermophore<br>Egg Crate Mattress<br>Bed Board<br>Cervical Pillow<br>Lumbar Cushion<br>Knee Support - L | **Liga Supply** |

On October 31, 2025, Brune purportedly issued a prescription in the name of VB for:

| **Item(s) Prescribed** | **Prescription Provided to:** |
|---|---|
| Wearable PEMF Device | **Curatech Supply** |

On November 6, 2025, Brune purportedly issued a prescription in the name of VB, despite not examining or otherwise treating VB on that date, for:

| **Item(s) Prescribed** | **Prescription Provided to:** |
|---|---|
| Orthopedic Position Seat | Non-Defendant DME supplier |

On November 7, 2025, Brune purportedly issued two separate prescriptions in the name of VB, despite not examining or otherwise treating VB on that date, for:

| | **Item(s) Prescribed** | **Prescription Provided to:** |
|---|---|---|
| 1 | Osteogenesis Stimulator | Non-Defendant DME supplier |
| 2 | Cold Compression Therapy System | Non-Defendant DME supplier |

On November 6, 2025, Feldman purportedly issued a prescription in the name of VB, despite not examining or otherwise treating VB on that date, for:

| **Item(s) Prescribed** | **Prescription Provided to:** |
|---|---|
| Cervical Traction w/ Pump | **Curatech Supply** |

On November 21, 2025, Feldman purportedly issued a prescription in the name of VB, despite not examining or otherwise treating VB on that date, for:

| **Item(s) Prescribed** | **Prescription Provided to:** |
|---|---|
| Whirlpool<br>Infrared Lamp<br>Massager<br>EMS (4 Leads) | **Curatech Supply** |

On December 10, 2025, after an examination with Feldman, Feldman purportedly issued a prescription in the name of VB for:

| **Item(s) Prescribed** | **Prescription Provided to:** |
|---|---|
| LSO APL Custom Fitted | **Curatech Supply** |

(ix) On November 1, 2025, an Insured named AE was purportedly involved in a motor vehicle accident and thereafter purportedly started treatment at the Kimball St. Clinic. After an initial examination with Feldman on November 3, 2025, Feldman purportedly issued a prescription in the name of AE for:

| **Item(s) Prescribed** | **Prescription Provided to:** |
|---|---|
| Water Circulation Unit<br>LSO<br>Thermophore<br>Egg Crate Mattress<br>Bed Board<br>Cervical Pillow<br>Lumbar Cushion | **Curatech Supply** |

On November 10, 2025, Feldman purportedly issued a prescription in the name of AE, despite not examining or otherwise treating AE on that date, for:

| **Item(s) Prescribed** | **Prescription Provided to:** |
|---|---|
| Shoulder - L | **Curatech Supply** |

On November 21, 2025, Brune purportedly issued three separate prescriptions in the name of AE, despite not examining or otherwise treating AE on that date, for:

| | **Item(s) Prescribed** | **Prescription Provided to:** |
|---|---|---|
| 1 | Orthopedic Position Seat | **Curatech Supply** |

| | | |
|---|---|---|
| 2 | Osteogenesis Stimulator | Non-Defendant DME supplier |
| 3 | Cold Compression Therapy System | Non-Defendant DME supplier |

On November 21, 2025, Feldman purportedly issued a prescription in the name of AE, despite not examining or otherwise treating AE on that date, for:

| **Item(s) Prescribed** | **Prescription Provided to:** |
|---|---|
| Cervical Traction Unit w/ Pump | **Curatech Supply** |

On December 1, 2025, after an examination with Feldman, Feldman purportedly issued a prescription in the name of AE for:

| **Item(s) Prescribed** | **Prescription Provided to:** |
|---|---|
| Whirlpool<br>Infrared Lamp<br>Massager<br>EMS (4 Leads) | **Curatech Supply** |

On December 10, 2025, Feldman purportedly issued a prescription in the name of AE, despite not examining or otherwise treating AE on that date, for:

| **Item(s) Prescribed** | **Prescription Provided to:** |
|---|---|
| LSO APL Custom Fitted | **Curatech Supply** |

(x) On November 6, 2025, an Insured named SP was purportedly involved in a motor vehicle accident and thereafter purportedly started treatment at the Kimball St. Clinic. After an initial examination with Feldman on November 10, 2025, Feldman purportedly issued a prescription in the name of SP for:

| **Item(s) Prescribed** | **Prescription Provided to:** |
|---|---|
| Water Circulation Unit<br>LSO<br>Thermophore<br>Egg Crate Mattress<br>Bed Board<br>Cervical Pillow<br>Lumbar Cushion<br>Knee Support – R | **Curatech Supply** |

On November 21, 2025, Brune purportedly issued three separate prescriptions in the name of SP, including duplicate prescriptions, despite not examining or otherwise treating SP on that date, for:

| | **Item(s) Prescribed** | **Prescription Provided to:** |
|---|---|---|
| 1 | Osteogenesis Stimulator | Non-Defendant DME supplier |
| 2 | Osteogenesis Stimulator | Non-Defendant DME supplier |
| 3 | Cold Compression Therapy System | Non-Defendant DME supplier |

150. These are only representative samples.

151. In fact, virtually all the Insureds identified in Exhibits "1" – "4" who treated at the Kimball St. Clinic were issued prescriptions for Fraudulent Equipment pursuant to the predetermined fraudulent protocols identified above, despite only being involved in relatively minor and low-impact motor vehicle accidents.

### D. The Defendants' Manipulation of the Prescriptions

152. Once the Defendants obtained the prescriptions purportedly issued by the Referring Providers as a result of the Defendants' collusive arrangements with the John Doe Defendants, the Defendants used the prescriptions to bill GEICO for whatever DME or OD they wanted.

153. In doing so, the Defendants did not bill GEICO for medically necessary DME and OD as determined by a licensed healthcare provider. Instead, the Defendants unlawfully decided what DME and OD to provide Insureds without a proper prescription from a licensed healthcare provider.

154. As part of the Defendants' common fraudulent scheme and collusive arrangement with the John Doe Defendants, they utilized the vague and generic prescriptions purportedly issued by the Referring Providers to misrepresent to GEICO the nature of the items actually prescribed and misrepresent that the Fraudulent Equipment was for DME/OD that was determined by a licensed healthcare provider to be medically necessary for each Insured.

155. Upon obtaining the vague and generic prescriptions from Clinic Controllers or other persons associated with the Clinics pursuant to the predetermined protocols and collusive arrangements described above, the Defendants were provided with the opportunity to choose one of several different pieces of Fraudulent Equipment, with varying reimbursement rates in the applicable fee schedule, that relate to the vague and generic terms indicated in the prescriptions.

156. The ability to choose which specific type of DME and/or OD to provide an individual is specifically reserved for healthcare providers authorized by law to prescribe DME and/or OD.

157. As unlicensed healthcare professionals, the Paper Owner Defendants were and are not legally authorized to prescribe or direct that an Insured receive any specific type of DME and/or OD. Similarly, the DME Entities are not licensed professional corporations and do not employ any healthcare professionals who can legally prescribe or direct that an Insured receive any specific type of DME and/or OD.

158. However, when the Defendants received vague and generic prescriptions for Fraudulent Equipment to purportedly provide Insureds, many of the items in the prescriptions were not specific enough to identify a specific item of DME and/or OD that could be provided to the Insureds.

159. As a result, and as part of their common scheme, whenever the vague and generic prescriptions identified a type of Fraudulent Equipment that had multiple different HCPCS Codes, which are based on the specific and unique features associated with the item, the Defendants each chose to bill GEICO using the same specific HCPCS Codes thereby representing that they purportedly provided those unique pieces of Fraudulent Equipment to the Insureds.

160. In a legitimate setting, upon receiving a vague and generic prescription for a type

of DME and/or OD, the provider of DME and/or OD would contact the referring healthcare provider to request clarification on the specific items and features necessary to dispense to each patient.

161. However, in all of the claims identified in Exhibits “1” – “4”, whenever there was a vague and generic prescription for a type of DME and/or OD, the Defendants never contacted the Referring Provider to request clarification. Instead, the Defendants made their own determination as to which unique item of Fraudulent Equipment to provide each Insured.

162. Furthermore, in each and every circumstance where the vague and generic prescriptions allowed the Defendants to choose a unique piece of Fraudulent Equipment, the Defendants billed GEICO for, and thereby chose to purportedly provide the Insured with, the type of Fraudulent Equipment that resulted in one of the higher maximum reimbursable amounts under the Fee Schedule.

163. For example, in many of the prescriptions issued to the Defendants that are part of the claims identified in Exhibits “1” – “4”, the prescriptions requested that the Defendants provide generic items such as a “LSO” without any further specification.

164. This vague and generic language in the prescriptions from the Referring Providers for lumbar supports directly relates to over 20 different unique HCPCS Codes, each with its own distinguishing features and maximum reimbursable amount, which can be dispensed to Insureds, including:

(i) HCPCS Code L0625, a lumbar orthosis device that is flexible, prefabricated and off-the-shelf, which has a maximum reimbursement rate of $43.27.

(ii) HCPCS Code L0626, a lumbar orthosis device with rigid posterior panel(s) that is prefabricated but customized to fit a specific patient, which has a maximum reimbursement rate of $61.25.

(iii) HCPCS Code L0627, a lumbar orthosis device with rigid anterior and

posterior panels that is prefabricated but customized to fit a specific patient, which has a maximum reimbursement rate of $322.98.

(vii) HCPCS Code L0628, a lumbar-sacral orthosis device that is flexible, prefabricated and off-the-shelf, which has a maximum reimbursement rate of $65.92.

(viii) HCPCS Code L0629, a lumbar-sacral orthosis device that is flexible and custom fabricated, which has a maximum reimbursement rate of $175.00.

(ix) HCPCS Code L0630, a lumbar-sacral orthosis device with rigid posterior panel(s) that is prefabricated but customized to fit a specific patient, which has a maximum reimbursement rate of $127.26.

(x) HCPCS Code L0631, a lumbar-sacral orthosis device with rigid anterior and posterior panels that is prefabricated but customized to fit a specific patient, which has a maximum reimbursement rate of $806.64.

(xi) HCPCS Code L0632, a lumbar-sacral orthosis device with rigid anterior and posterior panels that is custom fabricated, which has a maximum reimbursement rate of $1,150.00.

(xii) HCPCS Code L0633, a lumbar-sacral orthosis device with rigid posterior frame/panel(s) that is prefabricated but customized to fit a specific patient, which has a maximum reimbursement rate of $225.31.

(xiii) HCPCS Code L0634, a lumbar-sacral orthosis device with rigid posterior frame/panel(s) that is custom fabricated, which has a maximum reimbursement rate of $759.92.

(xiv) HCPCS Code L0635, a lumbar-sacral orthosis device with lumbar flexion and rigid posterior frame/panels that is prefabricated, which has a maximum reimbursement rate of $765.98.

(xv) HCPCS Code L0636, a lumbar-sacral orthosis device with lumbar flexion and rigid posterior frame/panels that is custom fabricated, which has a maximum reimbursement rate of $1,036.35.

(xvi) HCPCS Code L0637, a lumbar-sacral orthosis device with rigid anterior and posterior frame/panels that is prefabricated but customized to fit a specific patient, which has a maximum reimbursement rate of $844.13.

(xvii) HCPCS Code L0638, a lumbar-sacral orthosis device with rigid anterior and posterior frame/panels that is custom fabricated, which has a maximum reimbursement rate of $1,036.35.

(xviii) HCPCS Code L0639, a lumbar-sacral orthosis device with rigid shell(s)/panel(s) that is prefabricated but customized to fit a specific patient, which has a maximum reimbursement rate of $844.13.

(xix) HCPCS Code L0640, a lumbar-sacral orthosis device with rigid shell(s)/panel(s) that is custom fabricated, which has a maximum reimbursement rate of $822.21.

(xx) HCPCS Code L0641, a lumbar orthosis device with rigid posterior panel(s) that is prefabricated and off-the-shelf, which has a maximum reimbursement rate of $53.80.

(xxi) HCPCS Code L0642, a lumbar orthosis device with rigid anterior and posterior panels that is prefabricated and off-the-shelf, which has a maximum reimbursement rate of $283.76.

(xxii) HCPCS Code L0643, a lumbar-sacral orthosis device with rigid posterior panel(s) that is prefabricated and off-the-shelf, which has a maximum reimbursement rate of $111.80.

(xxiii) HCPCS Code L0648, a lumbar-sacral orthosis device with rigid anterior and posterior panels that is prefabricated and off-the-shelf, which has a maximum reimbursement rate of $708.65.

(xxiv) HCPCS Code L0649, a lumbar-sacral orthosis device with rigid posterior frame/panel(s) that is prefabricated and off-the-shelf, which has a maximum reimbursement rate of $197.95.

(xxv) HCPCS Code L0650, a lumbar-sacral orthosis device with rigid anterior and posterior frame/panels that is prefabricated and off-the-shelf, which has a maximum reimbursement rate of $741.59.

(xxvi) HCPCS Code L0651, a lumbar-sacral orthosis device with rigid shell(s)/panel(s) that is prefabricated and off-the-shelf, which has a maximum reimbursement rate of $741.59.

165. As unlicensed healthcare providers, the DME Entities and the Paper Owner Defendants were not legally permitted to determine which of the above-available options were best suited for each Insured that had generic prescriptions for a “LSO”.

166. Here, Defendants never contacted any of the Referring Providers whose names appeared on the vague and generic prescriptions for lumbar sacral related Fraudulent Equipment

and instead took it upon themselves to decide which specific type of Fraudulent Equipment they would bill GEICO for, and accordingly purportedly provide the Insureds.

167. In response to such prescriptions, each of the DME Entities virtually always submitted a charge of $844.13 using HCPCS code L0637 pursuant to these generic prescriptions, which has one of the highest maximum reimbursable amounts out of the lumbar support items in the Fee Schedule.

168. Additionally, and as part of Defendants' common scheme and the control by the Secret Owner, virtually every time that each of the DME Entities received a prescription from the Referring Providers for a "LSO APL Control Custom Fitted", Defendants each billed GEICO using HCPCS Code L0632 requesting a reimbursement of $1,150.00, and thereby asserted that they provided the Insureds with that specific item, which resulted in further needlessly inflated charges to GEICO.

169. Similarly, and as part of the common scheme and control of the Secret Owner, each and every time that each of the DME Defendants received a vague prescription from the Referring Providers for a "Shoulder", Defendants chose to supply and bill GEICO using HCPCS Code L3674 requesting a reimbursement of $896.92, despite the Fee Schedule containing 18 different types of shoulder orthoses.

170. Further, and as part of Defendants' common scheme and the control of the Secret Owner, each and every time that each of the DME Entities received a vague prescription from the Referring Providers for a "Knee Support", each of the Defendants chose to supply and bill GEICO using HCPCS Code L1832 requesting a reimbursement of $607.55, despite the Fee Schedule containing 20 different types of knee orthoses.

171. These are only representative examples. In virtually all of the claims for Fraudulent

Equipment identified in Exhibits "1" – "4" that are based upon vague and generic language in prescriptions provided by the Referring Providers, the Defendants decided the unique type of Fraudulent Equipment to purportedly provide Insureds without any legal authority to do so or any clarification from the prescribing healthcare provider.

### E. The Defendants' Common Fraudulent Misrepresentations Regarding the DME and OD Purportedly Dispensed

172. In addition to obtaining medically unnecessary prescriptions based upon predetermined fraudulent protocols, collusive arrangements with the John Doe Defendants and dispensing the Fraudulent Equipment without a licensed healthcare provider determining the specific DME/OD was medically necessary, the Defendants each submitted bills to GEICO that misrepresented the DME/OD provided to the Insureds – to the extent that any DME/OD actually was provided.

173. As part of Defendants' common scheme and controlled by the Secret Owner, the bills submitted to GEICO and other New York automobile insurers by Defendants made virtually identical misrepresentations regarding the HCPCS Codes used for the Fee Schedule items purportedly provided and the maximum reimbursement rate charged for Non-Fee Schedule items.

174. Specifically, the bills submitted to GEICO by the Defendants each misrepresented, to the extent that any Fraudulent Equipment was provided, that the type of Fraudulent Equipment matched the HCPCS Codes identified in the bills to GEICO, when in fact they did not.

175. Further, the bills submitted to GEICO by the Defendants each misrepresented, to the extent that any Fraudulent Equipment was provided, that the charges for Non-Fee Schedule items were less than or equal to the maximum reimbursement rate allowable under the Fee Schedule, when in fact they were not.

#### 1. The Defendants Fraudulently Misrepresented the Fee Schedule Items

**Purportedly Provided**

176. When Defendants submitted bills to GEICO and other New York automobile insurers, they represented that the Fraudulent Equipment was not only provided to the Insureds, but also that the HCPCS codes used on the bills properly described the type of Fraudulent Equipment that was provided to the Insureds.

177. As part of the Defendants' common scheme and their operation at the direction and control of the Secret Owner, each of the DME Entities made virtually identical misrepresentations in the HCPCS Codes used to bill GEICO.

178. As indicated above, the Fee Schedule specifically defines the requirements for each HCPCS Code to bill for DME and/or OD.

179. Additionally, Palmetto provides specific characteristics and requirements that DME and OD must meet in order to qualify for reimbursement under a specific HCPCS Code for both Fee Schedule items and Non-Fee Schedule items.

180. By submitting bills to GEICO containing specific HCPCS Codes, Defendants each represented that the Fraudulent Equipment they purportedly provided to Insureds appropriately corresponded to the HCPCS Codes contained within each bill.

181. However, in many of the claims for Fraudulent Equipment identified in Exhibits "1" – "4", when Defendants submitted bills to GEICO, they fraudulently represented to GEICO that the HCPCS codes used to bill GEICO were accurate and appropriate for the Fraudulent Equipment purportedly provided to the Insureds – to the extent that any Fraudulent Equipment was actually provided.

182. Accordingly, to the extent the prescriptions were actually authorized in the first place, the John Doe Defendants and Referring Providers purposefully provided prescriptions to

Defendants that contained general categories of Fraudulent Equipment to purportedly provide the Insureds.

183. Based upon the vague and generic prescriptions that Defendants received, Defendants were able to choose between multiple types of products that would fit the vague description contained on the prescription.

184. As part of their common scheme, although several options were available to Defendants based upon the vague and generic prescriptions, Defendants often billed GEICO – and likely other New York automobile insurers – using HCPCS Codes that contained one of the higher reimbursement amounts and did so for their financial benefit.

185. However, despite billing for Fraudulent Equipment using HCPCS Codes that had one of the higher reimbursement amounts, to the extent that Defendants provided any of the Fraudulent Equipment, the HCPCS codes in the bills submitted to GEICO often severely misrepresented the type of Fraudulent Equipment that was purportedly provided to the Insureds.

186. For example, each of Defendants submitted bills to GEICO that fraudulently misrepresented the type of Fraudulent Equipment that they purportedly provided by billing GEICO for customized pieces of Fraudulent Equipment when the Fraudulent Equipment was not customized at all – to the extent that Fraudulent Equipment was actually provided.

187. As identified in the claims contained within Exhibits "1" – "4", Defendants often billed GEICO for Fraudulent Equipment that was purportedly customized for the Insured. Each HCPCS Code, as defined either by the applicable fee schedule or Palmetto, will specify whether the specific item provided to a patient is either "off-the-shelf" or specifically "custom-fabricated" or "custom-fitted" for that individual patient.

188. In order to help clarify the term "custom-fabricated", Palmetto defined a custom-

fabricated orthotic as something that "is individually made for a specific patient. No other patient would be able to use this item. A custom fabricated item is a device which is fabricated based on clinically derived and rectified castings, tracings, measurements, and/or other images (such as x-rays) of the body part. The fabrication may involve using calculations, templates and components. This process requires the use of basic materials including, but not limited to plastic, metal, leather or cloth in the form of uncut or unshaped sheets, bars, or other basic forms and involves substantial work such as vacuum forming, cutting, bending, molding, sewing, drilling and finishing prior to fitting on the patient". See Palmetto, Correct Coding –3-D Printed Orthotic Devices.

189. In essence, a custom-fabricated orthotic is created and manufactured from scratch for use by a specific patient.

190. To help clarify the term "custom-fitted", Palmetto defined a custom-fitted orthotic as something that "requires more than minimal self-adjustment at the time of delivery in order to provide an individualized fit, i.e., the item must be trimmed, bent, molded (with or without heat), or otherwise modified resulting in alterations beyond minimal self-adjustment." See Palmetto, Correct Coding – Definitions Used for Off-the-Shelf versus Custom Fitted Prefabricated Orthotics (Braces) – Revised.

191. One of the key factors in identifying a "custom-fitted" orthotic is whether the item requires "minimal self-adjustment" or "substantial modification." Minimum self-adjustment, which for an off-the-shelf orthotic means adjustment that the "beneficiary, caretaker for the beneficiary, or supplier of the device can perform and that does not require the services of a certified orthotist (that is, an individual who is certified by the American Board for Certification in Orthotics and Prosthetics, Inc., or by the Board for Orthotist/Prosthetist Certification) or an individual who has specialized training. For example, adjustment of straps and closures, bending

or trimming for final fit or comfort (not all-inclusive) falls into this category." See Palmetto, Correct Coding – Definitions Used for Off-the-Shelf versus Custom Fitted Prefabricated Orthotics (Braces) – Revised.

192. By contrast, a substantial modification, which is required for a custom-fitted orthotic, is defined as "changes made to achieve an individualized fit of the item that requires the expertise of a certified orthotist or an individual who has equivalent specialized training in the provision of orthotics such as a physician, treating practitioner, an occupational therapist, or physical therapist in compliance with all applicable Federal and State licensure and regulatory requirements. A certified orthotist is defined as an individual who is certified by the American Board for Certification in Orthotics and Prosthetics, Inc., or by the Board for Orthotist/Prosthetist Certification." See Palmetto, Correct Coding – Definitions Used for Off-the-Shelf versus Custom Fitted Prefabricated Orthotics (Braces) – Revised.

193. As shown in the claims identified within Exhibits "1" – "4", Defendants often billed for Fraudulent Equipment that was purportedly "custom-fabricated" or "custom-fitted" for each Insured when – and to the extent that Fraudulent Equipment was actually provided – the items were never custom fabricated or fitted, as that term is defined by Palmetto.

194. Based upon the prescriptions allegedly issued by the Referring Providers, Defendants each submitted numerous bills to GEICO for custom fabricated back braces under HCPCS Code L0632 which contained a charge for $1,150.00, customized back braces under HCPCS Code L0637 which contained a charge for $844.13, custom fabricated shoulder orthoses using HCPCS Code L3674 which contained a charge for $896.92, custom fabricated knee orthoses using HCPCS Code L1844 which contained a charge for $1,107.70, custom knee orthoses using HCPCS Code L1832 which contained a charge for $607.55, and customized thoracic-lumbar-

sacral orthoses using HCPCS Code L0456 which contained a charge for $778.11.

195. The products assigned to HCPCS Codes L0632, L0637, L3674, L1844, L1832, and L0456 are types of orthoses that are customized to fit a particular patient by an individual with expertise, not the prefabricated, off-the-shelf products that could be adjusted by the patients (by simply tightening the straps) and which were dispensed by Defendants.

196. Instead, to the extent that Defendants provided any Fraudulent Equipment billed to GEICO as custom-fitted or custom-fabricated OD, including the charges for L0632, L0637, L3674, L1844, L1832, and L0456, the Fraudulent Equipment was provided without taking any action to custom-fabricate or custom-fit the OD to the Insureds. To the extent that Defendants attempted to make any adjustments to the DME received by Insureds identified in Exhibits "1" – "4", Defendants only provided minimal self-adjustment, as defined by Palmetto, which only supports charges for off-the-shelf items.

197. In keeping with the fact that Defendants misrepresented that they custom-fabricated or fit OD purportedly provided to Insureds and billed to GEICO, the Paper Owner Defendants are not certified orthotists and did not complete sufficient training to become a certified orthotist.

198. In addition to Defendants collectively submitting over a thousand charges that falsely represented the Defendants provided custom fabricated or custom fit OD, the Defendants also each submitted bills to GEICO using HCPCS codes that knowingly misrepresented the type of Fraudulent Equipment that was purportedly provided to the Insureds, to the extent that any DME actually was provided.

199. The claims identified in Exhibits "1" - "4" for HCPCS Code E0272 are another example of how Defendants fraudulently misrepresented the Fee Schedule items purportedly provided to Insureds – to the extent that any Fraudulent Equipment was actually provided.

200. Each of the claims identified within Exhibits "1" - "4" for HCPCS Code E0272 contained a charge for $155.52 based upon prescriptions for an "Egg Crate Mattress".

201. However, the product represented by HCPCS Code E0272 is defined as a foam rubber mattress, which is an actual full-size mattress, not a mattress topper or pad in the shape of an egg crate.

202. Despite billing GEICO using HCPCS Code E0272, the items provided by Defendants – to the extent that Defendants provided the Insureds with any item – were not foam rubber mattresses as required by HCPCS Code E0272.

203. By contrast, to the extent that any items were provided, they were mattress pads or toppers in the shape of egg crates, not an actual mattress. Mattress pads are Fee Schedule items listed under HCPCS Code E0199, which is defined as a "Dry pressure pad for mattress, standard mattress length and width."

204. Unlike the fraudulent charges for $155.52 for each eggcrate mattress billed under HCPCS Code E0272 – and in keeping with the fact that the fraudulent charges were part of Defendants' common scheme to defraud GEICO and other automobile insurers – the Fee Schedule sets a maximum reimbursement rate of $19.48 for each mattress pad/topper billed under HCPCS Code E0199.

205. In each of the claims identified within Exhibits "1" - "4" where Defendants billed for Fraudulent Equipment under HCPCS Code E0272, each of the bills fraudulently misrepresented that Defendants provided the Insureds with equipment that satisfies the requirements of HCPCS Code E0272.

206. The claims identified in Exhibits "1" – "4" for HCPCS Code E2611 are another example of how Defendants fraudulently misrepresented the Fee Schedule items purportedly

provided to Insureds – to the extent that any Fraudulent Equipment was actually provided – as part of their common scheme.

207. Each of the claims identified within Exhibits "1" – "4" for HCPCS Code E2611 contained a charge for $282.40 based upon prescriptions for a "Lumbar Cushion".

208. However, the product represented by HCPCS Code E2611 is defined as a general use wheelchair cushion with a width of less than 22 inches.

209. Despite billing GEICO using HCPCS Code E2611, the items provided by Defendants – to the extent that Defendants provided the Insureds with any item in response to the prescriptions for a lumbar cushion – were not cushions for use with a wheelchair.

210. In keeping with the fact that the cushions provided to the Insureds were not for a wheelchair, virtually none of the Insureds identified in Exhibits "1" – "4" who were provided with a cushion by Defendants that was billed to GEICO under HCPCS Code E2611, were in a wheelchair

211. By contrast, to the extent that any items were provided, the items were positioning cushions, which are Fee Schedule items listed under HCPCS Code E0190. HCPCS Code E0190 is defined as a "Positioning cushion/pillow/wedge, any shape or size, includes all components and accessories."

212. Unlike the fraudulent charges for $282.40 for each "Lumbar Cushion" billed under HCPCS Code E2611 – and in keeping with the fact that the fraudulent charges were part of Defendants' common scheme to defraud GEICO and other automobile insurers – the Fee Schedule sets a maximum reimbursement rate of $22.04 for each positioning cushion billed under HCPCS Code E0190.

213. In each of the claims identified within Exhibits "1" – "4" where Defendants billed

for Fraudulent Equipment under HCPCS Code E2611, each of the bills fraudulently misrepresented that Defendants provided the Insureds with equipment that satisfies the requirements of HCPCS Code E2611.

214. The claims identified in Exhibits "1" – "4" for HCPCS Codes E0747 and E0760 are another example of how Defendants fraudulently misrepresented the Fee Schedule items purportedly provided to Insureds – to the extent that any Fraudulent Equipment was actually provided – as part of their common scheme.

215. Each of the claims identified within Exhibits "1" – "4" for HCPCS Code E0747 contained a charge of $3,300.00 and for HCPCS Code E0760 contained a charge of $2,700.00.

216. However, the products represented by HCPCS Codes E0747 and E0760 are defined as osteogenesis stimulators meant to stimulate bone growth in specific medical circumstances.

217. Despite billing GEICO using HCPCS Codes E0747 and E0760, the items provided by the Defendants – to the extent that the Defendants provided the Insureds with any item – were not osteogenesis stimulators as required by HCPCS Codes E0747 and E0760.

218. In each of the claims identified within Exhibits "1"- "4" where the Defendants billed for Fraudulent Equipment under HCPCS Codes E0747 and E0760, each of the bills fraudulently misrepresented that the Defendants provided the Insureds with equipment that satisfies the requirements of HCPCS Codes E0747 and E0760.

219. The claims identified in Exhibits "1" – "4" for HCPCS Code E0277 are another example of how Defendants fraudulently misrepresented the Fee Schedule items purportedly provided to Insureds – to the extent that any Fraudulent Equipment was actually provided – as part of their common scheme.

220. Each of the claims identified within Exhibits "1" – "4" for HCPCS Code E0277

contained a charge of $3,961.75.

221. However, the product represented by HCPCS Code E0277 is defined as a powered pressure-reducing air mattress, meant to prevent the formation of pressure ulcers in bed-bound individuals.

222. Despite billing GEICO using HCPCS Code E0277, the items provided by the Defendants – to the extent that the Defendants provided the Insureds with any item – were not powered pressure-reducing air mattresses as required by HCPCS Code E0277.

223. In each of the claims identified within Exhibits "1"- "4" where the Defendants billed for Fraudulent Equipment under HCPCS Code E0277, each of the bills fraudulently misrepresented that the Defendants provided the Insureds with equipment that satisfies the requirements of HCPCS Code E0277.

224. The claims identified in Exhibits "1" – "4" for HCPCS Code T5001 is another example of how each of the Defendants fraudulently misrepresented the Fee Schedule items purportedly provided to Insureds – to the extent that any Fraudulent Equipment was actually provided.

225. Each of the claims identified within Exhibits "1" – "4" for HCPCS Code T5001 contained a charge of $756.03 based upon prescriptions for an "Orthopedic Car Seat" or "Orthopedic Position Seat".

226. However, the product represented by HCPCS Code T5001 is defined as a positioning seat for persons (primarily children) with special orthopedic needs, such as cerebral palsy, whose postural needs cannot be safely met by less costly alternatives such as the vehicle's restraint system or other restraint systems, and the person cannot use a standard/commercially available car seat.

227. The following picture represents the type of car seat contemplated by HCPCS Code T5001:



228. However, the orthopedic car seats purportedly provided by Defendants – to the extent that any items were provided – were not positioning seats for person with special orthopedic needs and instead qualified as positioning cushions, which are Fee Schedule items listed under HCPCS Code E0190, defined as a "positioning cushion/pillow/wedge, any shape or size, includes all components and accessories", and having a maximum reimbursement rate of $22.04 per unit.

229. Unlike the fraudulent charges for $756.03 for each "Orthopedic Car Seat" billed under HCPCS Code T5001 – and in keeping with the fact that the fraudulent charges were part of the Defendants' scheme to defraud GEICO and other automobile insurers – the Fee Schedule sets a maximum reimbursement rate of $22.04 for each positioning cushion billed under HCPCS Code E0190.

230. In each of the claims identified within Exhibits "1" – "4" where the Defendants billed for Fraudulent Equipment under HCPCS Code T5001, each of the bills fraudulently

misrepresented that the Defendants provided the Insureds with equipment that satisfies the requirements of HCPCS Code T5001.

231. The claims identified in Exhibits "1" – "4" for HCPCS Code E0480 are another example of how Defendants fraudulently misrepresented the Fee Schedule items purportedly provided to Insureds – to the extent that any Fraudulent Equipment was actually provided – as part of their common scheme.

232. Each of the claims identified within Exhibits "1" – "4" for HCPCS Code E0480 contained a charge of $355.56 based upon prescriptions for a "Massager".

233. However, the product represented by HCPCS Code E0480 is defined as airway clearance device percussor, which is used to help prevent aspiration in a patient by clearing excessive mucus and are typically prescribed to patients diagnosed with cystic fibrosis, chronic bronchitis, muscular dystrophy or other conditions which inhibit a patient's ability to expectorate.

234. Despite billing GEICO – and other New York automobile insurers – using HCPCS Code E0480, the items provided by the Defendants – to the extent that the Defendants provided the Insureds with any item – were not airway clearance devices as required by HCPCS Code E0480.

235. By contrast, to the extent that any items were provided, they were personal massagers. Personal massagers are Non-Fee Schedule items, which should have been billed under HCPCS Code E1399.

236. As a Non-Fee Schedule Item, the reimbursement for HCPCS Code E1399 is the lesser of either 150% of the acquisition cost to the Defendants or the cost to the general public.

237. Unlike the fraudulent charges for $355.56 for each "massager" billed under HCPCS Code E0480 – and in keeping with the fact that the fraudulent charges were part of the Defendants'

scheme to defraud GEICO and other automobile insurers – the Defendants' acquisition cost of these massagers was significantly less than the $355.56 charged to GEICO.

238. In each of the claims identified within Exhibits "1"- "4" where the Defendants billed for Fraudulent Equipment under HCPCS Code E0480, each of the bills fraudulently misrepresented that the Defendants provided the Insureds with equipment that satisfies the requirements of HCPCS Code E0480.

239. The claims identified in Exhibits "1" – "4" for HCPCS Code E0274 are another example of how, as part of their common scheme, each of the Defendants fraudulently misrepresented the Fee Schedule items purportedly provided to Insureds – to the extent that any Fraudulent Equipment was actually provided.

240. Each of the claims identified within Exhibits "1" – "4" for HCPCS Code E0274 contained a charge for $101.85 based upon prescriptions for a "bed board".

241. However, the product represented by HCPCS Code E0274 is defined as an over-bed table and is a table akin to those found in hospitals that permit a bed-bound individual the use of a table while confined to a bed.

242. Despite billing GEICO using HCPCS Code E0274, the items provided by the Defendants – to the extent that the Defendants provided the Insureds with any item – were not over-bed tables as required by HCPCS Code E0274.

243. By contrast, to the extent that any items were provided, they were bed boards, or large, flat pieces of cardboard that are placed under a mattress to make the mattress firmer and can keep the mattress from sinking. A bed board is listed under HCPCS Code E0273, which is a Non-Fee Schedule Item.

244. As a Non-Fee Schedule Item, the reimbursement for HCPCS Code E0273 is the

lesser of either 150% of the acquisition cost to the Defendants or the cost to the general public.

245. In each of the claims identified within Exhibits “1”- “4” where the Defendants billed for Fraudulent Equipment under HCPCS Code E0274, each of the bills fraudulently misrepresented that the Defendants provided the Insureds with equipment that satisfies the requirements of HCPCS Code E0274.

246. These are only representative examples. In the bills submitted to GEICO, and as shown in the charges identified in Exhibits “1” – “4” for Fee Schedule items, the Defendants regularly misrepresented the Fraudulent Equipment provided to the Insureds, to the extent that any Fraudulent Equipment was provided, in order to maximize the amount of No-Fault Benefits that they could obtain from GEICO.

### 2. The Defendants Fraudulently Misrepresented the Rate of Reimbursement for Non-Fee Schedule Items

247. As indicated above, under the No-Fault Laws, Non-Fee Schedule items are reimbursable as the lesser of: (i) 150% of the legitimate acquisition cost; or (ii) the cost to the general public for the same item.

248. By submitting bills to GEICO for Non-Fee Schedule items, Defendants each represented that they requested permissible reimbursement amounts that were calculated as the lesser of: (i) 150% of the legitimate acquisition cost; or (ii) the cost to the general public for the specific item.

249. However, and as part of their common scheme and control by the Secret Owner, in virtually all of the charges to GEICO identified in Exhibits “1” - “4” for Non-Fee Schedule items, Defendants fraudulently represented to GEICO that the reimbursement sought was the lesser of: (i) 150% of the legitimate acquisition cost; or (ii) the cost to the general public for the same item.

250. Instead, Defendants submitted bills to GEICO containing virtually identical charges

that significantly inflated the permissible reimbursement amount of Non-Fee Schedule items in order to maximize the amount of No-Fault Benefits they were able to obtain from GEICO and other automobile insurers.

251. The Defendants were able to perpetrate this scheme to fraudulently overcharge Non-Fee Schedule items by providing Insureds – to the extent they actually provided any Fraudulent Equipment – with low-cost and low-quality Fraudulent Equipment.

252. When Defendants submitted bills to GEICO seeking No-Fault Benefits for Non-Fee Schedule items, the charges fraudulently represented 150% of Defendants' acquisition cost of purportedly high-quality items. In actuality, Defendants' legitimate acquisition cost for the low-quality items was significantly less.

253. In keeping with the fact that Defendants fraudulently represented the permissible reimbursement amounts in the bills submitted to GEICO for the Non-Fee Schedule items solely for their financial benefit, Defendants purposefully attempted to conceal their effort to overcharge GEICO for Non-Fee Schedule items by never submitting a copy of their acquisition invoices in conjunction with their bills.

254. The Defendants did not include invoices showing their legitimate cost to acquire the low-cost and low-quality Non-Fee Schedule items in the bills submitted to GEICO because the invoices would have shown that the permissible reimbursement amounts were significantly less than the charges contained in the bills.

255. As part of their common scheme, the charges submitted to GEICO for Non-Fee Schedule items identified in Exhibits "1" - "4" virtually always misrepresented the permissible reimbursement amount.

256. For example, Defendants each billed GEICO for infrared heat lamps under HCPCS

Code E0205 with a charge of $210.12 per unit that was falsely represented as a permissible reimbursement amount for the Non-Fee Schedule item.

257. Unlike the fraudulent charges for $210.12 submitted by Defendants under HCPCS Code E0205 for infrared heat lamps, the maximum reimbursement rate Defendants were entitled to receive was significantly less.

258. The Defendants also each billed GEICO for EMS Units under HCPCS Code E0745 with a charge of $350.00 per unit that was falsely represented as a permissible reimbursement amount for the Non-Fee Schedule item.

259. Unlike the fraudulent charges for $350.00 submitted by Defendants under HCPCS Code E0745 for EMS Units, the maximum reimbursement rate Defendants were entitled to receive was significantly less.

260. The Defendants also each billed GEICO for whirlpools under HCPCS Code E1310 with a charge of $424.00 per unit that was falsely represented as a permissible reimbursement amount for the Non-Fee Schedule item.

261. Unlike the fraudulent charges for $424.00 submitted by Defendants under HCPCS Code E1310 for whirlpools, the maximum reimbursement rate Defendants were entitled to receive was significantly less.

262. These are only representative examples. In each of the claims identified within Exhibits "1" - "4" for Non-Fee Schedule items, each of Defendants fraudulently misrepresented in the bills submitted to GEICO that the charges were the lesser of 150% of the acquisition cost or the cost to the general public.

263. In the bills submitted to GEICO, and as shown in the charges identified in Exhibits "1" – "4", the Defendants regularly misrepresented and inflated the charges submitted to GEICO

for Non-Fee Schedule items, to the extent that any Fraudulent Equipment was provided, in order to maximize the amount of No-Fault Benefits that they could obtain from GEICO.

### F. The Fraudulent Billing Defendants Submitted or Caused to be Submitted to GEICO

264. To support their fraudulent charges, Defendants systematically submitted or caused to be submitted hundreds of NF-3 forms, HCFA-1500 forms, and/or treatment reports to GEICO through and in the name of the DME Entities, seeking payment for the Fraudulent Equipment.

265. The NF-3 forms, HCFA-1500 forms, and treatment reports that Defendants submitted or caused to be submitted to GEICO were false and misleading in the following material respects:

(i) The NF-3 forms, HCFA-1500 forms, and the prescriptions uniformly misrepresented to GEICO that the Defendants provided Fraudulent Equipment pursuant to legitimate prescriptions from licensed healthcare providers for reasonable and medically necessary DME and/or OD and therefore were entitled to receive No-Fault Benefits. In fact, the Defendants were not entitled to receive No-Fault Benefits because, to the extent that the Defendants provided any Fraudulent Equipment, it was pursuant to a fraudulent scheme that was designed and implemented to exploit the patients for financial gain so as to benefit the Defendants and others not presently known, without regard for genuine patient care, and included dispensing Fraudulent Equipment that was not medically necessary and prescribed pursuant to predetermined fraudulent protocols;

(ii) The NF-3 forms, HCFA-1500 forms, and the prescriptions uniformly misrepresented to GEICO that the Defendants provided Fraudulent Equipment pursuant to legitimate prescriptions from licensed healthcare providers for reasonable and medically necessary DME and/or OD and therefore were entitled to receive No-Fault Benefits. In fact, the Defendants were not entitled to receive No-Fault Benefits because, to the extent that the Defendants provided any Fraudulent Equipment, it was pursuant to a fraudulent scheme that included dispensing Fraudulent Equipment based on prescriptions secured through collusive arrangements with the John Doe Defendants, including prescriptions that were otherwise illegitimate because they contained photocopied or otherwise duplicated signatures;

(iii) The NF-3 forms, HCFA-1500 forms, and the prescriptions uniformly misrepresented to GEICO that the Defendants provided Fraudulent

Equipment pursuant to legitimate prescriptions from licensed healthcare providers for reasonable and medically necessary DME and/or OD and therefore were entitled to receive No-Fault Benefits. In fact, the Defendants were not entitled to receive No-Fault Benefits because, to the extent that the Defendants provided any Fraudulent Equipment, it was based on decisions made by laypersons, not based upon lawful prescriptions from licensed healthcare providers for medically necessary items;

(iv) The NF-3 forms, HCFA-1500 forms, and treatment reports uniformly misrepresented to GEICO that the Defendants provided Fraudulent Equipment that directly corresponded to the HCPCS Codes contained within each form and therefore were entitled to receive No-Fault Benefits. In fact, the Defendants were not entitled to receive No-Fault Benefits because – to the extent that the Defendants provided any Fraudulent Equipment to the Insureds – the Fraudulent Equipment often did not meet the specific requirements for the HCPCS Codes identified in the NF-3 forms and HCFA-1500 forms; and

(v) The NF-3 forms, HCFA-1500 forms, and treatment reports, prescriptions, and delivery receipts uniformly misrepresented to GEICO the reimbursement amount for the Non-Fee Schedule items provided to the Insureds, to the extent that the Defendants provided any Fraudulent Equipment and therefore were entitled to receive No-Fault Benefits. In fact, the Defendants were not entitled to receive No-Fault Benefits because – to the extent that the Defendants provided any Fraudulent Equipment to the Insureds – falsified the permissible reimbursement amounts for Fraudulent Equipment identified in the NF-3 forms and HCFA-1500 forms.

## III. The Defendants' Fraudulent Concealment and GEICO's Justifiable Reliance

266. The Defendants legally and ethically are obligated to act honestly and with integrity in connection with the provision of DME and OD to Insureds, and their actual submission of charges to GEICO.

267. To induce GEICO to promptly pay the charges for Fraudulent Equipment, Defendants have gone to great lengths to systematically conceal their fraud.

268. Specifically, the Defendants knowingly misrepresented and concealed facts in order to prevent GEICO from discovering that the provision of the Fraudulent Equipment was pursuant to a common insurance fraud scheme that was designed and implemented to exploit the patients

for financial gain so as to benefit the Defendants and others not presently known (i.e. the John Doe Defendants), without regard for genuine patient care.

269. Additionally, the Defendants knowingly misrepresented and concealed facts in order to prevent GEICO from discovering that the provision of the Fraudulent Equipment was pursuant to an insurance fraud scheme, which included dispensing Fraudulent Equipment that was not medically necessary and prescribed pursuant to predetermined fraudulent protocols and secured through collusive arrangements, including prescriptions that contained photocopied or otherwise duplicated signatures.

270. Defendants also knowingly misrepresented and concealed that the prescriptions for Fraudulent Equipment were based upon decisions made by laypersons who did not have the legal authority to issue medically necessary DME/OD, and not by an actual healthcare provider's prescription for medically necessary DME/OD, in order to prevent GEICO from discovering that Fraudulent Equipment was billed to GEICO for financial gain.

271. In addition, the Defendants knowingly misrepresented and concealed facts to prevent GEICO from discovering that the HCPCS Codes for Fraudulent Equipment contained in the bills submitted by the Defendants to GEICO did not accurately reflect the type of Fraudulent Equipment purportedly provided to the Insureds.

272. Finally, the Defendants also knowingly misrepresented the permissible reimbursement amount of the Non-Fee Schedule items contained in the bills submitted by Defendants to GEICO and did not include any invoices to support the charges in order to prevent GEICO from discovering that Non-Fee Schedule items were billed to GEICO for financial gain.

273. The Defendants operated their fraudulent scheme in a "quick hit" fashion designed to frustrate GEICO's efforts to identify fraud, shifting the billing from one DME Entity to the next

over the course of several months. The billing and supporting documentation submitted by Defendants, when viewed in isolation, did not reveal its fraudulent nature.

274. The Defendants hired law firms to pursue collection of the charges associated with the Fraudulent Equipment from GEICO and other insurers. These law firms routinely file numerous individual, expensive, and time-consuming collection proceedings, in piece-meal fashion against GEICO and other insurers. Defendants' collection efforts through the filing and prosecution of numerous separate no-fault collection proceedings, which proceedings may continue for years, is an essential part of their fraudulent scheme, since they know it is impractical for an arbitrator or civil court judge in a single no-fault arbitration or civil court proceeding, typically involving a single bill, to uncover or address Defendants' large-scale, complex fraud scheme involving numerous patients across numerous different clinics located throughout the metropolitan area. The purpose of the mass filings of no-fault collection proceedings is to obtain adjudication on the fraudulent billing while obfuscating the fraudulent activity and further perpetuating the RICO enterprise.

275. In fact, Defendants continue to have legal counsel pursue collection against GEICO and other insurers without regard for the fact that Defendants have been engaged in fraud.

276. GEICO is under statutory and contractual obligations to promptly and fairly process claims within 30 days. The facially valid documents submitted to GEICO in support of the fraudulent charges at issue, combined with the material misrepresentations and fraudulent litigation activity described above, were designed to and did cause GEICO to rely upon them. As a result, GEICO incurred damages of more than $1 million based upon the fraudulent charges representing payments voluntarily made by GEICO to Defendants in reliance on their submitted billing.

277. Based upon Defendants' material misrepresentations and other affirmative acts to

conceal their fraud from GEICO, GEICO did not discover and could not reasonably have discovered that its damages were attributable to fraud until shortly before it filed this Complaint.

## FIRST CAUSE OF ACTION
**Goni Supply, Pro Health Supply, Liga Supply, and Curatech Supply**
**(Declaratory Judgment, 28 U.S.C. §§ 2201 and 2202)**

278. GEICO repeats and realleges each and every allegation set forth above as if fully set forth at length herein.

279. There is an actual case in controversy between GEICO and each of the DME Entities regarding more than $1.2 million in fraudulent pending billing that has been submitted to GEICO in the names of the DME Entities.

280. The DME Entities have no right to receive payment for any pending bills submitted to GEICO because the bills for Fraudulent Equipment were not based upon medical necessity but were instead submitted as part of an insurance fraud scheme that was designed and implemented to exploit the patients for financial gain so as to benefit the Defendants and others not presently known (i.e. the John Doe Defendants), without regard for genuine patient care.

281. The DME Entities have no right to receive payment for any pending bills submitted to GEICO because the bills for Fraudulent Equipment were pursuant to an insurance fraud scheme, which included dispensing Fraudulent Equipment that was not medically necessary and prescribed pursuant to predetermined fraudulent protocols and prescriptions secured through collusive arrangements, including prescriptions that were otherwise illegitimate because they contained photocopied or otherwise duplicated signatures.

282. The DME Entities have no right to receive payment for any pending bills submitted to GEICO because the DME Entities purportedly provided Fraudulent Equipment as a result of decisions made by laypersons, not based upon prescriptions issued by healthcare providers who

are licensed to issue such prescriptions.

283. The DME Entities have no right to receive payment for any pending bills submitted to GEICO because – to the extent the DME Entities actually provided any Fraudulent Equipment – the DME Entities fraudulently misrepresented the type of Fraudulent Equipment purportedly provided to Insureds as the HCPCS Codes identified in the bills did not accurately represent the Fraudulent Equipment provided to the Insureds.

284. The DME Entities have no right to receive payment for any pending bills submitted to GEICO because – to the extent the DME Entities provided any Fraudulent Equipment – the DME Entities fraudulently misrepresented that the charges for Non-Fee Schedule items contained within the bills to GEICO were less than or equal to the maximum permissible reimbursement amount.

285. Accordingly, GEICO requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that Defendants have no right to receive payment for any pending bills submitted to GEICO under the names of Goni Supply, Pro Health Supply, Liga Supply, and Curatech Supply.

**SECOND CAUSE OF ACTION**
**Against the Paper Owner Defendants and John Doe Defendant "1"**
**(Violation of RICO, 18 U.S.C. § 1962(c))**

286. GEICO repeats and realleges each and every allegation set forth above as if fully set forth at length herein.

287. Goni Supply, Pro Health Supply, Liga Supply, and Curatech Supply together constitute an association-in-fact "enterprise" (the "DME Entity Enterprise"), as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

288. The members of the DME Entity Enterprise are and have been associated through

time, joined in purpose, and organized in a manner amenable to hierarchal and consensual decision making, with each member fulfilling a specific and necessary role to carry out and facilitate its common purpose. Specifically, Goni Supply, Pro Health Supply, Liga Supply, and Curatech Supply are ostensibly independent businesses – with different names and tax identification numbers – that were used as vehicles to achieve a common purpose – namely, to facilitate the submission of fraudulent charges to GEICO.

289. The DME Entity Enterprise operated under four separate names and tax identification numbers in order to limit the time period and volume of bills submitted under any individual name, in an attempt to avoid attracting the attention and scrutiny of GEICO and other New York automobile insurers to the volume of billing and the pattern of fraudulent charges originating from any one business. Accordingly, the carrying out of this scheme would be beyond the capacity of each member of the DME Entity Enterprise acting singly or without the aid of each other.

290. The DME Entity Enterprise is distinct from and has an existence beyond the pattern of racketeering that is described herein, namely by recruiting, employing, overseeing and coordinating many individuals who have been responsible for facilitating and performing a wide variety of administrative and ostensibly professional functions beyond the acts of mail fraud (i.e., the submission of the fraudulent bills to GEICO and other insurers), by creating and maintaining patient files and other records, by recruiting and supervising personnel, by negotiating and executing various contracts and/or illegal verbal agreements, by maintaining the bookkeeping and accounting functions necessary to manage the receipt and distribution of the insurance proceeds, and by retaining collection lawyers whose services also were used to generate payments from insurance companies to support all of the aforesaid functions.

291. The Paper Owner Defendants and John Doe Defendant "1" have each been

employed by and/or associated with the DME Entity Enterprise.

292. Paper Owner Defendants and John Doe Defendant "1" knowingly have conducted and/or participated, directly or indirectly, in the conduct of the DME Entity Enterprise's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges seeking payments that the DME Entity Enterprise was not entitled to receive under the No-Fault Laws, because: (i) the bills submitted to GEICO for the provision of Fraudulent Equipment were not based upon medical necessity but were instead submitted pursuant to an insurance fraud scheme that was designed and implemented to exploit the patients for financial gain so as to benefit the Defendants and others not presently known, without regard for genuine patient care, and included dispensing Fraudulent Equipment that was not medically necessary and prescribed pursuant to predetermined fraudulent protocols; (ii) the Fraudulent Equipment was dispensed based on prescriptions secured through collusive arrangements with the John Doe Defendants and issued pursuant to predetermined protocols, including prescriptions that were otherwise illegitimate because they contained photocopied or otherwise duplicated signatures; (iii) the Fraudulent Equipment was dispensed pursuant to decisions by laypersons who are not legally authorized to prescribe DME/OD; (iv) to the extent the DME Entities actually provided any Fraudulent Equipment, the DME Entities each fraudulently misrepresented the type of Fraudulent Equipment purportedly provided to Insureds as the HCPCS Codes identified in the bills did not accurately represent the Fraudulent Equipment provided to the Insureds; and (v) to the extent the DME Entities actually provided any Fraudulent Equipment, the DME Entities fraudulently misrepresented that the reimbursement rate for the Non-Fee Schedule items were less than or equal to the maximum permissible reimbursement amount when in fact

these amounts were grossly inflated and well above the maximum permissible reimbursement amount. The fraudulent billings and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described in the chart annexed hereto as Exhibits "1" - "4".

293. The DME Entity Enterprise's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular ways in which the Paper Owner Defendants and John Doe Defendant "1" operated the DME Entities, inasmuch as the DME Entities never operated as legitimate DME/OD providers, never were entitled to bill for or collect No-Fault Benefits, and acts of mail fraud therefore were essential in order for the DME Entities to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that Defendants continue to attempt collection on the fraudulent billing submitted through the DME Entities to the present day.

294. The DME Entity Enterprise is engaged in inherently unlawful acts inasmuch as it continues to attempt collection on fraudulent billing submitted to GEICO and other New York automobile insurers. These inherently unlawful acts are taken by the DME Entity Enterprise in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent No-fault billing.

295. GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $1 million pursuant to the fraudulent bills submitted by Defendants through the DME Entity Enterprise.

296. By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper

## THIRD CAUSE OF ACTION
**Against the Paper Owner Defendants and the John Doe Defendants**
**(Violation of RICO, 18 U.S.C. § 1962(d))**

297. GEICO repeats and realleges each and every allegation set forth above as if fully set forth at length herein.

298. The DME Entity Enterprise is an association-in-fact "enterprise" as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

299. The Paper Owner Defendants and the John Doe Defendants are employed by and/or associated with the DME Entity Enterprise.

300. The Paper Owner Defendants and the John Doe Defendants knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of the DME Entity Enterprise's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted fraudulent charges seeking payments that the DME Entities were not entitled to receive under the No-Fault Laws because: (i) the bills submitted to GEICO for the provision of Fraudulent Equipment were not based upon medical necessity but were instead submitted pursuant to an insurance fraud scheme that was designed and implemented to exploit the patients for financial gain so as to benefit the Defendants and others not presently known, without regard for genuine patient care, and included dispensing Fraudulent Equipment that was not medically necessary and prescribed pursuant to predetermined fraudulent protocols; (ii) the Fraudulent Equipment was dispensed based on prescriptions secured through collusive arrangements with the John Doe Defendants and issued pursuant to predetermined protocols, including prescriptions that were otherwise illegitimate because they contained photocopied or otherwise duplicated signatures; (iii) the Fraudulent Equipment was dispensed pursuant to decisions by

laypersons who are not legally authorized to prescribe DME; (iv) to the extent the DME Entities actually provided any Fraudulent Equipment, the DME Entities each fraudulently misrepresented the type of Fraudulent Equipment purportedly provided to Insureds as the HCPCS Codes identified in the bills did not accurately represent the Fraudulent Equipment provided to the Insureds; and (v) to the extent the DME Entities actually provided any Fraudulent Equipment, the DME Entities fraudulently misrepresented that the reimbursement rate for the Non-Fee Schedule items were less than or equal to the maximum permissible reimbursement amount when in fact these amounts were grossly inflated and well above the maximum permissible reimbursement amount. The fraudulent billings and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described in the chart annexed hereto as Exhibits "1" - "4".

301. The Paper Owner Defendants and the John Doe Defendants knew of, agreed to, and acted in furtherance of the common overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of fraudulent charges to GEICO.

302. GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $1 million pursuant to the fraudulent bills submitted by Defendants through the DME Entity Enterprise.

303. By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

**FOURTH CAUSE OF ACTION**
**Against Goginava, Goni Supply, and John Doe Defendant "1"**
**(Common Law Fraud)**

304. GEICO repeats and realleges each and every allegation set forth above as if fully set forth at length herein.

305. Goginava, Goni Supply, and John Doe Defendant "1" intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of hundreds of fraudulent bills seeking payment for Fraudulent Equipment.

306. The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, that the Fraudulent Equipment that was dispensed was for reasonable and medically necessary DME and/or OD when in fact it was dispensed pursuant to an insurance fraud scheme that was designed and implemented to exploit the patients for financial gain so as to benefit the Defendants and others not presently known, without regard for genuine patient care, and included dispensing Fraudulent Equipment that was not medically necessary and prescribed pursuant to predetermined fraudulent protocols, (ii) in every claim, that the Fraudulent Equipment dispensed was pursuant to a legitimate prescription from a licensed healthcare provider, when in fact the Fraudulent Equipment was dispensed based on prescriptions secured through collusive arrangements with the John Doe Defendants and issued pursuant to predetermined protocols, including prescriptions that were otherwise illegitimate because they contained photocopied or otherwise duplicated signatures; (iii) in many claims, that Fraudulent Equipment was issued based upon legitimate prescriptions by licensed healthcare providers when the Fraudulent Equipment was provided, to the extent any Fraudulent Equipment was provided, pursuant to decisions from laypersons who are not legally authorized to prescribe DME and/or OD; (iv) in many claims, that Fraudulent Equipment provided to the Insureds accurately reflected the HCPCS Codes contained in the bills submitted to GEICO when the Fraudulent Equipment provided, to the extent that any Fraudulent Equipment actually was provided, did not meet the requirements for the specific HCPCS Codes billed to GEICO; and (v) in many claims, the

representation that the reimbursement rate for the Non-Fee Schedule items were less than or equal to the maximum permissible reimbursement amount when in fact these amounts were grossly inflated and well above the maximum permissible reimbursement amount. A representative sample of the fraudulent billings and corresponding mailings submitted to GEICO identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "1".

307. Goginava, Goni Supply, and John Doe Defendant "1" intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Goni Supply that were not compensable under New York no-fault insurance laws.

308. GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by reason of the above-described conduct in that it has paid at least $173,000.00 pursuant to the fraudulent bills submitted by Defendants through Goni Supply.

309. Goginava, Goni Supply, and John Doe Defendant "1"'s extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

310. Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other further relief the Court deems just and proper.

## FIFTH CAUSE OF ACTION
**Against Goginava, Goni Supply, and John Doe Defendant "1"**
**(Unjust Enrichment)**

311. GEICO repeats and realleges each and every allegation set forth above as if fully set forth at length herein.

312. As set forth above, Goginava, Goni Supply, and John Doe Defendant "1" have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

313. When GEICO paid the bills and charges submitted by or on behalf of Goni Supply for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on the improper, unlawful, and/or unjust acts of Goginava, Goni Supply, and John Doe Defendant "1".

314. Goginava, Goni Supply, and John Doe Defendant "1" have been enriched at GEICO's expense by GEICO's payments which constituted a benefit that Goginava, Goni Supply, and John Doe Defendant "1" voluntarily accepted notwithstanding their improper, unlawful and unjust billing scheme.

315. Retention of GEICO's payments by Goginava, Goni Supply, and John Doe Defendant "1" violates fundamental principles of justice, equity, and good conscience.

316. By reason of the above, Goginava, Goni Supply, and John Doe Defendant "1" have been unjustly enriched in an amount to be determined at trial, but in no event less than the total sum of $173,000.00.

**<u>SIXTH CAUSE OF ACTION</u>**
**Against the John Doe Defendants**
**(Aiding and Abetting Fraud)**

317. GEICO repeats and realleges each and every allegation set forth above as if fully set forth at length herein.

318. The John Doe Defendants knowingly aided and abetted the fraudulent scheme that was perpetrated on GEICO by Goginava, Goni Supply, and John Doe Defendant "1".

319. The acts of the John Doe Defendants in furtherance of the fraudulent scheme included, among other things, knowingly engaging in collusive arrangements with the Defendants

for the procurement of medically unnecessary prescriptions for Fraudulent Equipment issued pursuant to a pre-determined protocol to maximize profits without regard to patient care and routing those prescriptions directly to Goginava and Goni Supply and bypassing the Insureds.

320. The conduct of the John Doe Defendants in furtherance of the fraudulent scheme was significant and material. The conduct of the John Doe Defendants was a necessary part of and was critical to the success of the fraudulent scheme because, without their actions, there would have been no opportunity for Goginava, Goni Supply, and John Doe Defendant "1" to bill for Fraudulent Equipment and obtain payment from GEICO and other insurers.

321. The John Doe Defendants aided and abetted the fraudulent scheme in a calculated effort to induce GEICO into paying charges to Goginava, Goni Supply, and John Doe Defendant "1" for medically unnecessary Fraudulent Equipment because they sought to continue profiting through the fraudulent scheme.

322. The conduct of the John Doe Defendants caused GEICO to pay more than $173,000.00 pursuant to the fraudulent bills submitted through Goni Supply.

323. This extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

324. Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other further relief the Court deems just and proper.

## SEVENTH CAUSE OF ACTION
**Against Katsnelson, Pro Health Supply, and John Doe Defendant "1"**
**(Common Law Fraud)**

325. GEICO repeats and realleges each and every allegation set forth above as if fully set forth at length herein.

326. Katsnelson, Pro Health Supply, and John Doe Defendant "1" intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of hundreds of fraudulent bills seeking payment for Fraudulent Equipment.

327. The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, that the Fraudulent Equipment that was dispensed was for reasonable and medically necessary DME and/or OD when in fact it was dispensed pursuant to an insurance fraud scheme that was designed and implemented to exploit the patients for financial gain so as to benefit the Defendants and others not presently known, without regard for genuine patient care, and included dispensing Fraudulent Equipment that was not medically necessary and prescribed pursuant to predetermined fraudulent protocols, (ii) in every claim, that the Fraudulent Equipment dispensed was pursuant to a legitimate prescription from a licensed healthcare provider, when in fact the Fraudulent Equipment was dispensed based on prescriptions secured through collusive arrangements with the John Doe Defendants and issued pursuant to predetermined protocols, including prescriptions that were otherwise illegitimate because they contained photocopied or otherwise duplicated signatures; (iii) in many claims, that Fraudulent Equipment was issued based upon legitimate prescriptions by licensed healthcare providers when the Fraudulent Equipment was provided, to the extent any Fraudulent Equipment was provided, pursuant to decisions from laypersons who are not legally authorized to prescribe DME and/or OD; (iv) in many claims, that Fraudulent Equipment provided to the Insureds accurately reflected the HCPCS Codes contained in the bills submitted to GEICO when the Fraudulent Equipment provided, to the extent that any Fraudulent Equipment actually was provided, did not meet the requirements for the specific HCPCS Codes billed to GEICO; and (v) the representation that the

reimbursement rate for the Non-Fee Schedule items were less than or equal to the maximum permissible reimbursement amount when in fact these amounts were grossly inflated and well above the maximum permissible reimbursement amount. A representative sample of the fraudulent billings and corresponding mailings submitted to GEICO identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "2".

328. Katsnelson, Pro Health Supply, and John Doe Defendant "1" intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Pro Health Supply that were not compensable under New York no-fault insurance laws.

329. GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by reason of the above-described conduct in that it has paid at least $209,000.00 pursuant to the fraudulent bills submitted by Defendants through Pro Health Supply.

330. Katsnelson, Pro Health Supply, and John Doe Defendant "1"'s extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

331. Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other further relief the Court deems just and proper.

## EIGHTH CAUSE OF ACTION
**Against Katsnelson, Pro Health Supply, and John Doe Defendant "1"**
**(Unjust Enrichment)**

332. GEICO repeats and realleges each and every allegation set forth above as if fully set forth at length herein.

333. As set forth above, Katsnelson, Pro Health Supply, and John Doe Defendant "1" have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

334. When GEICO paid the bills and charges submitted by or on behalf of Pro Health Supply for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on the improper, unlawful, and/or unjust acts of Katsnelson, Pro Health Supply, and John Doe Defendant "1".

335. Katsnelson, Pro Health Supply, and John Doe Defendant "1" have been enriched at GEICO's expense by GEICO's payments which constituted a benefit that Katsnelson, Pro Health Supply, and John Doe Defendant "1" voluntarily accepted notwithstanding their improper, unlawful and unjust billing scheme.

336. Retention of GEICO's payments by Katsnelson, Pro Health Supply, and John Doe Defendant "1" violates fundamental principles of justice, equity, and good conscience.

337. By reason of the above, Katsnelson, Pro Health Supply, and John Doe Defendant "1" have been unjustly enriched in an amount to be determined at trial, but in no event less than the total sum of $209,000.00.

**NINTH CAUSE OF ACTION**
**Against the John Doe Defendants**
**(Aiding and Abetting Fraud)**

338. GEICO repeats and realleges each and every allegation set forth above as if fully set forth at length herein.

339. The John Doe Defendants knowingly aided and abetted the fraudulent scheme that was perpetrated on GEICO by Katsnelson, Pro Health Supply, and John Doe Defendant "1".

340. The acts of the John Doe Defendants in furtherance of the fraudulent scheme included, among other things, knowingly engaging in collusive arrangements with the Defendants

for the procurement of medically unnecessary prescriptions for Fraudulent Equipment issued pursuant to a pre-determined protocol to maximize profits without regard to patient care and routing those prescriptions directly to Katsnelson and Pro Health Supply and bypassing the Insureds.

341. The conduct of the John Doe Defendants in furtherance of the fraudulent scheme was significant and material. The conduct of the John Doe Defendants was a necessary part of and was critical to the success of the fraudulent scheme because, without their actions, there would have been no opportunity for Katsnelson, Pro Health Supply, and John Doe Defendant "1" to bill for Fraudulent Equipment and obtain payment from GEICO and other insurers.

342. The John Doe Defendants aided and abetted the fraudulent scheme in a calculated effort to induce GEICO into paying charges to Katsnelson, Pro Health Supply, and John Doe Defendant "1" for medically unnecessary Fraudulent Equipment because they sought to continue profiting through the fraudulent scheme.

343. The conduct of the John Doe Defendants caused GEICO to pay more than $209,000.00 pursuant to the fraudulent bills submitted through Pro Health Supply.

344. This extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

345. Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other further relief the Court deems just and proper.

## TENTH CAUSE OF ACTION
**Against Narovlyansky, Liga Supply, and John Doe Defendant "1"**
**(Common Law Fraud)**

346. GEICO repeats and realleges each and every allegation set forth above as if fully

set forth at length herein.

347. Narovlyansky, Liga Supply, and John Doe Defendant "1" intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of hundreds of fraudulent bills seeking payment for Fraudulent Equipment.

348. The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, that the Fraudulent Equipment that was dispensed was for reasonable and medically necessary DME and/or OD when in fact it was dispensed pursuant to an insurance fraud scheme that was designed and implemented to exploit the patients for financial gain so as to benefit the Defendants and others not presently known, without regard for genuine patient care, and included dispensing Fraudulent Equipment that was not medically necessary and prescribed pursuant to predetermined fraudulent protocols, (ii) in every claim, that the Fraudulent Equipment dispensed was pursuant to a legitimate prescription from a licensed healthcare provider, when in fact the Fraudulent Equipment was dispensed based on prescriptions secured through collusive arrangements with the John Doe Defendants and issued pursuant to predetermined protocols, including prescriptions that were otherwise illegitimate because they contained photocopied or otherwise duplicated signatures; (iii) in many claims, that Fraudulent Equipment was issued based upon legitimate prescriptions by licensed healthcare providers when the Fraudulent Equipment was provided, to the extent any Fraudulent Equipment was provided, pursuant to decisions from laypersons who are not legally authorized to prescribe DME and/or OD; (iv) in many claims, that Fraudulent Equipment provided to the Insureds accurately reflected the HCPCS Codes contained in the bills submitted to GEICO when the Fraudulent Equipment provided, to the extent that any Fraudulent Equipment actually was provided, did not meet the

requirements for the specific HCPCS Codes billed to GEICO; and (v) the representation that the reimbursement rate for the Non-Fee Schedule items were less than or equal to the maximum permissible reimbursement amount when in fact these amounts were grossly inflated and well above the maximum permissible reimbursement amount. A representative sample of the fraudulent billings and corresponding mailings submitted to GEICO identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "3".

349. Narovlyansky, Liga Supply, and John Doe Defendant "1" intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Liga Supply that were not compensable under New York no-fault insurance laws.

350. GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by reason of the above-described conduct in that it has paid at least $366,000.00 pursuant to the fraudulent bills submitted by Defendants through Liga Supply.

351. Narovlyansky, Liga Supply, and John Doe Defendant "1"'s extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

352. Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other further relief the Court deems just and proper.

## ELEVENTH CAUSE OF ACTION
**Against Narovlyansky, Liga Supply, and John Doe Defendant "1"**
**(Unjust Enrichment)**

353. GEICO repeats and realleges each and every allegation set forth above as if fully

set forth at length herein.

354. As set forth above, Narovlyansky, Liga Supply, and John Doe Defendant “1” have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

355. When GEICO paid the bills and charges submitted by or on behalf of Liga Supply for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on the improper, unlawful, and/or unjust acts of Narovlyansky, Liga Supply, and John Doe Defendant “1”.

356. Narovlyansky, Liga Supply, and John Doe Defendant “1” have been enriched at GEICO’s expense by GEICO’s payments which constituted a benefit that Narovlyansky, Liga Supply, and John Doe Defendant “1” voluntarily accepted notwithstanding their improper, unlawful and unjust billing scheme.

357. Retention of GEICO’s payments by Narovlyansky, Liga Supply, and John Doe Defendant “1” violates fundamental principles of justice, equity, and good conscience.

358. By reason of the above, Narovlyansky, Liga Supply, and John Doe Defendant “1” have been unjustly enriched in an amount to be determined at trial, but in no event less than the total sum of $366,000.00.

**<u>TWELFTH CAUSE OF ACTION</u>**
**Against the John Doe Defendants**
**(Aiding and Abetting Fraud)**

359. GEICO repeats and realleges each and every allegation set forth above as if fully set forth at length herein.

360. The John Doe Defendants knowingly aided and abetted the fraudulent scheme that was perpetrated on GEICO by Narovlyansky, Liga Supply, and John Doe Defendant “1”.

361. The acts of the John Doe Defendants in furtherance of the fraudulent scheme

included, among other things, knowingly engaging in collusive arrangements with the Defendants for the procurement of medically unnecessary prescriptions for Fraudulent Equipment issued pursuant to a pre-determined protocol to maximize profits without regard to patient care and routing those prescriptions directly to Narovlyansky and Liga Supply and bypassing the Insureds.

362. The conduct of the John Doe Defendants in furtherance of the fraudulent scheme was significant and material. The conduct of the John Doe Defendants was a necessary part of and was critical to the success of the fraudulent scheme because, without their actions, there would have been no opportunity for Narovlyansky, Liga Supply, and John Doe Defendant "1" to bill for Fraudulent Equipment and obtain payment from GEICO and other insurers.

363. The John Doe Defendants aided and abetted the fraudulent scheme in a calculated effort to induce GEICO into paying charges to Narovlyansky, Liga Supply, and John Doe Defendant "1" for medically unnecessary Fraudulent Equipment because they sought to continue profiting through the fraudulent scheme.

364. The conduct of the John Doe Defendants caused GEICO to pay more than $366,000.00 pursuant to the fraudulent bills submitted through Liga Supply.

365. This extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

366. Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other further relief the Court deems just and proper.

**THIRTEENTH CAUSE OF ACTION**
**Against Isaakov, Curatech Supply, and John Doe Defendant "1"**
**(Common Law Fraud)**

367. GEICO repeats and realleges each and every allegation set forth above as if fully

set forth at length herein.

368. Isaakov, Curatech Supply, and John Doe Defendant "1" intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of hundreds of fraudulent bills seeking payment for Fraudulent Equipment.

369. The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, that the Fraudulent Equipment that was dispensed was for reasonable and medically necessary DME and/or OD when in fact it was dispensed pursuant to an insurance fraud scheme that was designed and implemented to exploit the patients for financial gain so as to benefit the Defendants and others not presently known, without regard for genuine patient care, and included dispensing Fraudulent Equipment that was not medically necessary and prescribed pursuant to predetermined fraudulent protocols, (ii) in every claim, that the Fraudulent Equipment dispensed was pursuant to a legitimate prescription from a licensed healthcare provider, when in fact the Fraudulent Equipment was dispensed based on prescriptions secured through collusive arrangements with the John Doe Defendants and issued pursuant to predetermined protocols, including prescriptions that were otherwise illegitimate because they contained photocopied or otherwise duplicated signatures; (iii) in many claims, that Fraudulent Equipment was issued based upon legitimate prescriptions by licensed healthcare providers when the Fraudulent Equipment was provided, to the extent any Fraudulent Equipment was provided, pursuant to decisions from laypersons who are not legally authorized to prescribe DME and/or OD; (iv) in many claims, that Fraudulent Equipment provided to the Insureds accurately reflected the HCPCS Codes contained in the bills submitted to GEICO when the Fraudulent Equipment provided, to the extent that any Fraudulent Equipment actually was provided, did not meet the

requirements for the specific HCPCS Codes billed to GEICO; and (v) the representation that the reimbursement rate for the Non-Fee Schedule items were less than or equal to the maximum permissible reimbursement amount when in fact these amounts were grossly inflated and well above the maximum permissible reimbursement amount. A representative sample of the fraudulent billings and corresponding mailings submitted to GEICO identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "4".

370. Isaakov, Curatech Supply, and John Doe Defendant "1" intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Curatech Supply that were not compensable under New York no-fault insurance laws.

371. GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by reason of the above-described conduct in that it has paid at least $280,000.00 pursuant to the fraudulent bills submitted by Defendants through Curatech Supply.

372. Isaakov, Curatech Supply, and John Doe Defendant "1"'s extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

373. Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other further relief the Court deems just and proper.

**FOURTEENTH CAUSE OF ACTION**
**Against Isaakov, Curatech Supply, and John Doe Defendant "1"**
**(Unjust Enrichment)**

374. GEICO repeats and realleges each and every allegation set forth above as if fully

set forth at length herein.

375. As set forth above, Isaakov, Curatech Supply, and John Doe Defendant "1" have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

376. When GEICO paid the bills and charges submitted by or on behalf of Curatech Supply for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on the improper, unlawful, and/or unjust acts of Isaakov, Curatech Supply, and John Doe Defendant "1".

377. Isaakov, Curatech Supply, and John Doe Defendant "1" have been enriched at GEICO's expense by GEICO's payments which constituted a benefit that Isaakov, Curatech Supply, and John Doe Defendant "1" voluntarily accepted notwithstanding their improper, unlawful and unjust billing scheme.

378. Retention of GEICO's payments by Isaakov, Curatech Supply, and John Doe Defendant "1" violates fundamental principles of justice, equity, and good conscience.

379. By reason of the above, Isaakov, Curatech Supply, and John Doe Defendant "1" have been unjustly enriched in an amount to be determined at trial, but in no event less than the total sum of $280,000.00.

**FIFTEENTH CAUSE OF ACTION**
**Against the John Doe Defendants**
**(Aiding and Abetting Fraud)**

380. GEICO repeats and realleges each and every allegation set forth above as if fully set forth at length herein.

381. The John Doe Defendants knowingly aided and abetted the fraudulent scheme that was perpetrated on GEICO by Isaakov, Curatech Supply, and John Doe Defendant "1".

382. The acts of the John Doe Defendants in furtherance of the fraudulent scheme

included, among other things, knowingly engaging in collusive arrangements with the Defendants for the procurement of medically unnecessary prescriptions for Fraudulent Equipment issued pursuant to a pre-determined protocol to maximize profits without regard to patient care and routing those prescriptions directly to Isaakov and Curatech Supply and bypassing the Insureds.

383. The conduct of the John Doe Defendants in furtherance of the fraudulent scheme was significant and material. The conduct of the John Doe Defendants was a necessary part of and was critical to the success of the fraudulent scheme because, without their actions, there would have been no opportunity for Isaakov, Curatech Supply, and John Doe Defendant "1" to bill for Fraudulent Equipment and obtain payment from GEICO and other insurers.

384. The John Doe Defendants aided and abetted the fraudulent scheme in a calculated effort to induce GEICO into paying charges to Isaakov, Curatech Supply, and John Doe Defendant "1" for medically unnecessary Fraudulent Equipment because they sought to continue profiting through the fraudulent scheme.

385. The conduct of the John Doe Defendants caused GEICO to pay more than $280,000.00 pursuant to the fraudulent bills submitted through Curatech Supply.

386. This extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

387. Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other further relief the Court deems just and proper.

## JURY DEMAND

388. Pursuant to Federal Rule of Civil Procedure 38(b), GEICO demands a trial by jury.

**WHEREFORE**, Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company and GEICO Casualty Company demand that a judgment be entered in their favor and against Defendants as follows:

A. On the First Cause of Action against the DME Entities, a declaration pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, that the DME Entities have no right to receive payment for any pending bills submitted to GEICO;

B. On the Second Cause of Action against the Paper Owner Defendants and John Doe Defendant "1" for compensatory damages in favor of GEICO in an amount to be determined at trial but more than $1 million together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

C. On the Third Cause of Action against the Paper Owner Defendants and the John Doe Defendants for compensatory damages in favor of GEICO in an amount to be determined at trial but more than $1 million together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

D. On the Fourth Cause of Action against Goginava, Goni Supply, and John Doe Defendant "1" for compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $173,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

E. On the Fifth Cause of Action against Goginava, Goni Supply, and John Doe Defendant "1" for more than $173,000.00 in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper;

F. On the Sixth Cause of Action against the John Doe Defendants, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $173,000.00

together with punitive damages, costs, interest, and such other and further relief as this Court deems just and proper;

G. On the Seventh Cause of Action against Katsnelson, Pro Health Supply, and John Doe Defendant "1" for compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $209,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

H. On the Eighth Cause of Action against Katsnelson, Pro Health Supply, and John Doe Defendant "1" for more than $209,000.00 in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper;

I. On the Ninth Cause of Action against the John Doe Defendants, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $209,000.00 together with punitive damages, costs, interest, and such other and further relief as this Court deems just and proper;

J. On the Tenth Cause of Action against Narovlyansky, Liga Supply, and John Doe Defendant "1" for compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $366,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

K. On the Eleventh Cause of Action against Narovlyansky, Liga Supply, and John Doe Defendant "1" for more than $366,000.00 in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper;

L. On the Twelfth Cause of Action against the John Doe Defendants, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $366,000.00 together with punitive damages, costs, interest, and such other and further relief as this Court

deems just and proper;

M. On the Thirteenth Cause of Action against Isaakov, Curatech Supply, and John Doe Defendant "1" for compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $280,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

N. On the Fourteenth Cause of Action against Isaakov, Curatech Supply, and John Doe Defendant "1" for more than $280,000.00 in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper; and

O. On the Fifteenth Cause of Action against the John Doe Defendants, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $280,000.00 together with punitive damages, costs, interest, and such other and further relief as this Court deems just and proper.

Dated: August 6, 2026
Uniondale, New York

RIVKIN RADLER LLP

By: /s/ Barry I. Levy
Barry I. Levy, Esq.
Steven Henesy, Esq.
Philip P. Nash, Esq.
Michael Vanunu, Esq.
926 RXR Plaza
Uniondale, New York 11556
(516) 357-3000

*Counsel for Plaintiffs, Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company and GEICO Casualty Company*